M. E. O'BRIEN, Plaintiff,

v.

UNITED HOME LIFE INSURANCE COMPANY OF INDIANAPOLIS, INDIANA, an Indiana Corporation, Defendant.

No. 14012.

United States District Court
E. D. Michigan, S. D.
Jan. 25, 1957.

O'Brien & Nertney, Detroit, Mich., for plaintiff.

Fischer, Sprague, Franklin & Ford, Detroit, Mich., Myers, Northam & Myers, Indianapolis, Ind., for defendant.

PICARD, District Judge.

Action for specific performance to require transfer of 1800 shares of defendant's stock at $5.00 per share, plus cash and stock dividends, without obligation of plaintiff to resell said stock to defendant at any specified price.

### Findings of Fact

Two contracts—one covering plaintiff's employment and the other his purchase of 2,000 shares of defendant's stock—made and entered into on the same day—form the basis of this suit.

The salient sections of the stock purchase agreement (Exhibit 1) are as follows:

"Sec. 1. Said United Home Life Insurance Company does hereby agree to sell to M. E. O'Brien 2,000

shares of the Common Capital Stock of that company at $5.00 per share.

"Sec. 2. M. E. O'Brien does hereby agree that for three years following receipt of said stock he will either hold said stock, or, in the event he desires to sell all or any portion thereof, he will sell said stock to the United Home Life Insurance Company of Indianapolis, Indiana at $5.00 per share. No other disposition may be made of this stock except as enumerated in Section 3.

"Sec. 3. It is agreed that M. E. O'Brien may sell 300 shares only of said stock within the next three years at the current market value as of the date of the sale.

"Sec. 4. Should the Agency Contract executed on April 5, 1950 between the United Home Life Insurance Company and M. E. O'Brien not remain in force for three years, M. E. O'Brien shall immediately upon the termination of said Agency Contract sell to the United Home Life Insurance Company all the shares of stock received by him pursuant to this contract, less those sold in accordance with Section 3, provided, however, that in the event of the death of said M. E. O'Brien, the above mentioned stock shall belong to his estate and shall be delivered to his executors or administrators of his estate upon full payment of said stock at the stipulated price of $5.00 per share."

While initially we did not discern any involved legal questions, at the pre-trial it was claimed by plaintiff that he had been forced into resigning before the three year period specified in exhibit 1 above had expired. This necessitated inquiry by this court into the facts and circumstances surrounding the making and termination of said contracts and it developed that while plaintiff had a very fine reputation as an insurance man as to sagacity, efficiency, ability and integrity he was a man of advanced years and quite deaf.

It became apparent to this court therefore that it should—inter alia—make certain whether one of these three facts existed—

First, Was the contract ambiguous or incomplete;

Note: 1 Bouv.Law Dict., Rawle's Third Revision p. 186 defines a latent ambiguity as

"that which arises from some collateral circumstance or extrinsic matter in cases where the instrument itself is sufficiently certain and intelligible."

Second, Had any advantage been taken of the physical shortcomings of plaintiff; and

Third, Had defendant arbitrarily discharged plaintiff on a trumped up reason in order to deprive him of the right to purchase this stock?

With these questions in mind we made numerous efforts to learn the circumstances under which the contracts were made and to see if anything had been left out that should have been included in order to make the contracts clear and unambiguous. But all such efforts were discouraged, both parties throughout insisting that the contracts were complete and not ambiguous.

Here are some further facts that were either admitted or are now found by the court.

On April 16, 1952, less than three years after the contracts were entered into, (April 5th, 1950) defendant's executive officers came to Detroit and demanded plaintiff's resignation when, according to all the evidence, plaintiff displayed a surprising acquiescence. He immediately wrote out his resignation—not only once but twice. The second time was without any help from defendant. As a witness, plaintiff explained, rather weakly, that he did this because "if they didn't want me, I didn't want to continue with them". The plain unvarnished truth is that what defendant claimed was apparently true. Plaintiff had either signed up with another company or was on the verge of doing so and plaintiff

knew defendant knew this. At any rate there is no evidence of any coercion, trickery or fraud used by defendant but the most that can be said for the severance of the parties' business connection is that it was "mutual". And this court so finds. So that plaintiff's pre-trial statement that he could prove he had been forced into resigning was not borne out by any evidence presented to our court. Nor is there anything to show that any advantage was or could have been taken of Mr. O'Brien's age or hearing either at the time he entered into these contracts or when he submitted his resignation.

It is also well to know that plaintiff had been in the insurance business for years. Previous to 1950 he was connected with Franklin Life Insurance Company and defendant, a new company, had just been born. Its stock at that time was selling for considerably less than $5 per share, if selling at all, but plaintiff evidently saw possibilities and he contacted defendant to make arrangements for his employment. Defendant didn't come to him. Plaintiff succeeded in landing his job and was made defendant's state manager.

Exhibit 1 was entered into at the same time as his contract of employment and it is admitted that 200 of the 300 shares mentioned in that Exhibit 1 (Sec. 3) which plaintiff could sell (to his agents) throughout the state, or keep himself—whichever way he felt would best promote his own interests—were taken and paid for by him at $5 per share. These he sold. The other 1,800 were never asked for by plaintiff, never given plaintiff by defendant and of course never paid for. Nor was any legal tender ever made by plaintiff or anyone in his behalf.

Plaintiff got off to a fine start in his new job but the second year was apparently not going to be so good and by April it appeared that there would be some question about 1952 being as profitable as it should be. In the meantime shares of defendant's stock had become more valuable.

## Conclusions of Law

First we hold as a matter of law that regardless of what the parties agreed on as to the contracts' defects, shortcomings or ambiguities, we still had the right and duty to make inquiry on these matters if we considered it necessary in the interest of justice. As stated in South Florida Lumber Mills v. Breuchaud, 5 Cir., 51 F.2d 490, at page 493—

"It is settled law that under the rule applicable to a situation of this kind it was the duty of the trial court primarily to determine whether the matter sought to be orally proven has been integrated in the written agreement, by ascertaining from the conduct and language of the parties, and the surrounding circumstances, what was their intent."

We also hold that this court must accept any contract made—not rewrite it— and that since both parties agree that these two contracts should be read as one, that they are complete and not in any way ambiguous, such agreement by them is entitled to great weight. 12 American Jurisprudence, p. 787.

We therefore accept their position as not unreasonable and in doing so it then becomes our duty to construe these documents as one, gathering the intent of the parties from all four corners of the document, not section by section.

Victory Bottle Capping Machine Co. v. O. & J. Machine Co., 1 Cir., 280 F. 753; Duval v. Aetna Casualty & Surety Co., 304 Mich. 397, 8 N.W.2d 112.

We disagree with plaintiff's contention that the wording of the above contract is to be interpreted as the actual purchase by plaintiff of the 1,800 shares in dispute. We think the correct construction of that contract is as follows:

First, by Section 1, defendant agreed to sell 2,000 shares of its stock to plaintiff but the latter did not agree to purchase them and he was not legally bound

to do so. LeBaron Homes, Inc., v. Pontiac Housing Fund, Inc., 319 Mich. 310, 29 N.W.2d 704.

Second, by Section 2, plaintiff was required to hold the stock for three years if he purchased it (except 300 shares) or resell to defendant at the purchase price.

Third, if plaintiff did not remain an employee of defendant for three years he was required to resell the stock to defendant unless failure to continue employment was caused by death. In other words, plaintiff would gain an absolute right to the stock if, but only if, he, (a) remained in defendant's employ for three years; or (b) died while so employed.

Since by the express terms of the contract plaintiff was required to remain as an employee of defendant for three years before he gained absolute right to such stock, a fortiori, if the employment relationship was voluntarily terminated before that time plaintiff's right to the stock and his right to demand specific performance was thereby extinguished.

As stated in Sacramento Nav. Co. v. Salz, 273 U.S. 326, at page 329, 47 S.Ct. 368, at page 369, 71 L.Ed. 663:

" * * * a contract includes, not only the promises set forth in express words, but, in addition, all such implied provisions as are indispensable to effectuate the intention of the parties and as arise from the language of the contract and the circumstances under which it was made * * * "

In holding as we do that plaintiff's right to demand specific performance was conditioned upon his remaining in defendant's employ for the life of the agency contract, we do not mean to imply that defendant could have made it impossible for plaintiff to so remain and thereby deprive him of his right to the stock. The law implies a promise on defendant's part to refrain from doing anything which would hinder performance by plaintiff of any act upon which defendant's obligation to perform was conditioned. Uproar Co. v. National Broadcasting Co., 1 Cir., 81 F.2d 373. But in view of our holding in our findings of fact that the termination was by mutual consent plaintiff cannot claim that defendant must be required to perform because it discharged him in violation of the agency contract. If plaintiff does still make his claim he has failed to sustain the burden of proving the same.

We stress this issue, and since we have held as a "finding of fact" that plaintiff had not purchased the stock we now determine the same as a conclusion of law in construing that contract. There is nothing in the evidence and certainly nothing in the contract that bears out plaintiff's contention. This was not an agreement by Mr. O'Brien to buy this stock. It merely gave him the option to do so if he wanted to and if at any time during those two years defendant had said to plaintiff, "Come on, pay for your stock" plaintiff would have had a magnificent defense in refusing. That offer was a bonus he might realize on if and when he so desired, while still in defendant's employ.

But this holding does not, according to plaintiff, destroy plaintiff's right to recover because plaintiff claims that while still with the company he did repeatedly ask for that stock and was told by defendant that "there was no hurry". Evidently there was no hurry on either side because plaintiff made no further demand and in our findings of fact we held that he never asked for this stock while in defendant's employ.

Taking the testimony of plaintiff in its most favorable light to him, we hold that it falls far short of a request for the stock that he had an option to buy. The above words, he claims were used, might be interpreted both in his favor and against him but the fact that he made no further attempt in writing or otherwise to inform defendant that he wanted that stock is certainly not in his favor. At different times throughout the trial it was apparent that both plaintiff and his counsel were of the opinion that all plaintiff had was an "option to purchase" and that the contract (Section 1

above) did not make plaintiff a purchaser. Plaintiff so testified on the witness stand at least twice. But in any event if it could be construed that any conversation between the parties indicated a request by plaintiff for the stock to which he was entitled, then his failure to make tender is fatal. Richardson v. Lamb, 253 Mich. 659, 235 N.W. 817.

Admittedly there is no direct provision in the contract setting the date of payment by plaintiff, nor any direct provision regarding the amount at which plaintiff could sell that stock after holding it three years (Section 2), but since both parties insist that the contract is complete we must gather their intentions from within the four corners of the instrument and we find that even if plaintiff is entitled to this stock—we hold that he is not—he must pay $5 a share or $9,000 and having terminated his relationship with defendant must immediately re-sell the stock to defendant at the same price (Section 4). An idle gesture. As pointed out by defendant certainly plaintiff could have had no greater right to that stock after he quit the company than he had during the previous two years.

Furthermore, every act of this plaintiff from the date he resigned would indicate to this court that he understood the contract fully and that to him the contract was not ambiguous in any degree; for two years he knew he had an option to buy the stock if wanted to, but was not bound to buy; and that when he severed his connection with the company he was through with all rights to that stock. This is borne out by the evidence, for plaintiff testified that at the time he resigned he asked defendant's president, "What about my stock in the company?" and that defendant's president made some kind of an evasive answer like, "Well, we will take that up later". On this point defendant's president claims that he told plaintiff then and there that plaintiff had no stock coming. But here again we accept the testimony given by plaintiff and we find it hard to believe that plaintiff thinking that he had a right to that stock made no written demand for delivery of the same until April 20, 1953—more than a year after he resigned, although between these dates, April 16, 1952 and April 20, 1953, he wrote defendant twice concerning other matters.

Viewed in any light, whether the contract is complete or not; whether it is specific or vague; whether it is ambiguous or clear, plaintiff cannot recover, more particularly in view of his own position that the contract is not lacking in any essential.

Judgment for defendant.