Gene HILGENBERG et al., Plaintiffs-Appellees in Case No. 21666, Plaintiffs-Appellants in Case No. 22099,

v.

IOWA BEEF PACKERS, INC., an Iowa Corporation, Defendant-Appellant in Case No. 21666, Defendant-Appellee in Case No. 22099.

No. 53887.

Supreme Court of Iowa.

March 4, 1970.

As Modified on Rehearing May 5, 1970.

P. L. Nymann, Dakota City, Neb., and George F. Davis, of Sifford, Wadden & Davis, Sioux City, for defendant-appellant-appellee.

Malcolm D. Young and William E. Naviaux, Omaha, Neb., and White & McMartin, Harlan, for plaintiffs-appellees-appellants.

SNELL, Justice.

Two cases by the same plaintiffs against the same defendant were consolidated for trial and appeal.

Plaintiffs are former foremen and supervisory employees, as distinguished from hourly workers, employed by defendant Iowa Beef Packers, Inc. Defendant will be referred to as IBP.

The issues involve different benefits claimed by plaintiffs, i. e., right to a bonus for the fiscal year 1965 and the right to exercise a stock option. They stem from the same general program of developing and retaining key personnel.

■ We will first consider the bonus issue.

In the fall of 1963 IBP purchased lands and business of Iowa Pork, Inc., situate in Perry, Iowa, whereupon IBP made considerable changes and improvements in the operation of the plant, various employees taking part therein. Each plaintiff had been employed on an hourly basis. The testimony of each of the plaintiffs was substantially similar, and to the effect that the Perry plant manager M. R. (Bob) Gardner, since deceased, had asked each at different times to assume a supervisory capacity; that each employee had then asked about pay, and had been told separately that supervisors were paid weekly (in most instances $136.50) instead of hourly; that uniformly these shifts from hourly to weekly pay schedules would have resulted in a substantial reduction in income for each employee. Plaintiffs were reluctant to accept. Mr. Gardner, being so informed, had then said that each employee would receive as an ameliorative for the cut a bonus along with other fringes, each plaintiff understanding (vaguely and variously) that the bonus would be a percentage of their respective salaries, according to plant profits pooled for the bonus-paying purposes. No employee was told of the precise percentage according to which this promised bonus would be computed. Plaintiffs were from time to time told that a fund was being set aside for payment of bonuses.

Defendant offered evidence that weekly earnings of all plaintiffs were not reduced by promotion.

Plaintiffs separately accepted the change in position and remained in defendant's employment until October 23, 1965.

By agreement dated October 22, 1965, effective at the close of business on Saturday, October 23, 1965, defendant IBP sold the Perry plant and business to Oscar Mayer and Co., Inc. The evidence shows that the sale was at a substantial profit to IBP. Defendant's report showed a profit of $1,297,900.00.

The "Agreement of Sale" provided:

"1. *Sale of Property and Purchase Price.* In consideration of the payment of the purchase price of $4,300,000 by purchaser to seller, receipt of which is hereby acknowledged, seller hereby sells to purchaser and, in consideration of the representations, warranties and covenants hereinbelow made by seller, purchaser hereby purchases from seller, the following described property (herein sometimes referred to collectively as the Sold Property):

"A. *Real Property*

" * * *

"B. *Chattel Property*

" * * *

"C. *Intangible Property*

" * * *

"(c) The right to hire all present employees of the plant and the buying stations to the exclusion of seller; * * *."

The "Sellers' Covenants" included the following:

"It will use its best efforts to assist purchaser in retaining the present personnel of the plant and the buying stations and will not itself, for a period of 18 months from the date hereof, hire, or retain on its payroll, any of such personnel."

The "General Assignment and Conveyance" to Oscar Mayer & Co., Inc., included:

"(c) The right to hire all present employees of the plant and the buying stations to the exclusion of seller."

The "Representations and Warranties" of the seller provided (except for a union contract not involved here):

"The seller is not a party to * * * (ii) any pension, profit-sharing or bonus plan for any employee of the plant; (iii) any written or oral employment contract or arrangement with any employee of the plant which is not terminable at will; * * *."

The purchaser did not assume any of the claimed obligations of the seller involved in these cases.

It is quite obvious that the right to retain key personnel was one of the assets sold by IBP at a substantial profit.

Defendant's fiscal year ended October 30, seven days after the effective date of the sale.

Defendant refused to pay bonuses for 1965. Some of the plaintiffs received a bonus for 1964.

Defendant offered evidence and argues that prior to 1964 there had been a "bonus arrangement", but that after 1964, with the creation of a new "compensation committee", the entire compensatory system of defendant, including bonus arrangements, was overhauled, resulting in December 1964 in the termination of all of the company's "commitments" to pay bonuses; that thereafter all bonuses were purely "discretionary", according to: performance of individual recipient, profits of particular plant, and decisions of the compensation committee; that this new policy was announced and known to each of these plaintiffs as of December 1964. Some plaintiffs testified that they had even then been given assurances by Gardner that they would receive bonuses for 1965. There is no claim that any employee ever agreed to any change that would waive his right to a compensating bonus.

Defendant argues finally, even if there were an agreement to pay bonuses, still defendant was not liable to pay them inasmuch as: (a) their extent was neither definite nor computable; (b) eligibility therefor depended upon the particular employee's being an "active employee" at the (i) end of the fiscal year, October 30, and (ii) at distribution time in December, and the employment of these plaintiffs ceased one week prior to October 30, 1965, and hence they are disqualified.

The evidence showed that defendant for the fiscal year 1965 had allocated although not segregated the sum of $14,175 for the payment of these bonuses.

I. The trial court submitted to the jury 3 special verdicts. They were as follows with the jury's answers:

"Special Verdict No. 1—Have plaintiffs established an agreement for a wage bonus that is definite and computable? Answer 'yes' or 'no'. Answer: Yes.

"If 'no', skip to Special Verdict No. 4. If 'yes', answer Special Verdicts 2 and 3 and 4.

"Special Verdict No. 2—What is the total amount that was agreed to be paid as wage bonuses to all of these plaintiffs for the fiscal year ending October 30, 1965? Fill in amount. Answer: $14,175.00.

"Special Verdict No. 3—Have the plaintiffs established that they were eligible under agreement with the defendant for payment of a wage bonus for the fiscal year ending October 30, 1965? Answer 'yes' or 'no'. Answer: Yes."

Special Verdict No. 4 related to stock options discussed infra.

Judgment was entered upon the bonus verdicts. The trial court computed the apportionment of the judgment and entered judgment in favor of the individual plaintiffs with interest from January 1, 1966. The trial court computed the interest to March 15, 1969.

The actual apportionment mathematically is not challenged.

The appellant relies upon two assigned errors for reversal: (a) that there was no

evidence to support the finding of the jury and judgment of the trial court that defendant had agreed to pay a wage bonus that was definite and computable; and (b) the evidence affirmatively showed that plaintiffs were not eligible for a bonus according to the policy set by the compensation committee for bonus payments given after December 1964. Appellant thus raises two distinct issues: First, that defendant made no enforceable commitment to pay bonuses; second, that even if it did, still these plaintiffs have not shown themselves entitled to this commitment.

Appellant's primary argument seems centered about the first contention, with almost sole emphasis being on the last phrase thereof, viz: that the commitment—if any—was not so "definite and computable" as to allow the jury to base its finding upon other than mere conjecture and speculation. The sole citation for this proposition is Drake v. Block, 247 Iowa 517, 74 N.W.2d 577. Hence, while appellant might admit the existence of such a commitment, still it is argued that it must fail for indefiniteness. As appellant says: "Where, though a bonus or profit-sharing plan is contemplated by an employer and employees, no definite amount has been agreed upon and all matter concerning amount of bonus rests solely and exclusively with employer who has no fixed plan or schedule to be followed in determining amount of bonus, and such bonuses as were paid follow no set plan or percentage of salary paid, such understanding as to a bonus is too indefinite and uncertain to permit recovery of a bonus." This is essentially the principle stated in Drake, supra.

The case before us is clearly distinguishable from the Drake case. In Drake the contract of employment was unilateral and there was no evidence from which any bonuses due plaintiffs might be computed. In the case before us there was evidence of a promise to pay a bonus as an inducement to accept different work and a different method and rate of payment. Plaintiffs accepted and performed accordingly.

There was evidence (uncontradicted) that the bonus would be compensatory for the change. There was evidence that IBP had allocated $14,175 for the payment of these bonuses.

The jury accepted plaintiffs' version of the situation.

The findings of the jury and the judgment of the trial court are amply supported by the record.

II. Kollman v. McGregor, 240 Iowa 1331, 39 N.W.2d 302 involved the right of an employee to a proportionate share of a promised bonus when prematurely discharged without fault. The agreement was for one year. Plaintiff was discharged after about eight months.

The employer argued that the employee was not entitled to any part of the bonus because he did not stay with the employer a full year. This is from pages 1334 and 1335 of 240 Iowa, 39 N.W.2d at 304:

"Defendant's argument is without merit. Plaintiff's failure to work the full year was due to no fault of his but to his discharge without cause. Defendant prevented plaintiff from working the full year. Plaintiff's petition alleges the discharge was without cause and constituted a breach of the contract.

"There is much authority that where an agreement provides for a bonus for continuous service which is terminated by the employer through no fault of the employee, the latter is entitled to a proportionate share of the bonus according to the time served. Where, however, the employee voluntarily quits or is discharged for a reason attributable to his own fault, there is no right to recover any part of the bonus. Roberts v. Mays Mills, 184 N.C. 406, 114 S.E. 530, 28 A.L.R. 338, and Anno. 346; 56 C.J.S., Master and Servant § 98, (page 530) ' * * * recovery of a proportionate part of the bonus promised is generally permitted in cases growing out of the wrongful discharge of the employee during the specified term * * *.'; 35 Am.

Jur., Master and Servant, section 80. See also Willoughby Camera Stores v. Commissioner of Internal Revenue, 2 Cir., 125 F.2d 607; George A. Fuller Co. v. Brown, 4 Cir., 15 F.2d 672; Montgomery Ward & Co. v. Guignet, 112 Ind.App. 661, 45 N.E.2d 337, 340.

"That an agreement for a bonus for continuous service for a specified time is valid see Scott v. J. F. Duthie & Co., 125 Wash. 470, 216 P. 853, 28 A.L.R. 328, and Anno. 331; George A. Fuller Co. v. Brown, supra, 4 Cir., 15 F.2d 672, 676. See also Shiloff Grocery Co. v. Eberline, 199 Iowa 562, 202 N..W. 86."

III. As indicated, supra, the plant manager when the claimed agreements were made was M. R. Gardner. His employment contract was likewise assigned. IBP refused to recognize a stock option and refused to pay Mr. Gardner a bonus for 1965. Mr. Gardner brought actions in the United States District Court for the Northern District of Iowa. Those actions involved the issues of a stock option and bonus as do the cases before us. Mr. Gardner died April 28, 1967. On appeal the United States Court of Appeals for the Eighth Circuit on January 2, 1970 said:

"The District Court held that there was sufficient evidence from which the jury could determine whether there was an arrangement to pay the bonus, as well as the amount of such a bonus. The jury returned a verdict in the sum of $5,000 for Gardner.

"On appeal, IBP argues that its bonuses were given on an empirical basis with regard to the employee's performance and the profitability of the plant at which he worked and not with regard to a fixed formula. In support of its argument, IBP cites Drake v. Block, 247 Iowa 517, 74 N.W.2d 577 (1956), which denied an attempt to recover a bonus because the method employed for the payment of bonuses was too 'indefinite and uncertain.' Drake v. Block, [247 Iowa 517] 74 N.W.2d at 580.

"IBP's argument is not well taken. The record shows that there was sufficient evidence to submit the question to the jury." See No. 19,618 Maryjo Feldmiller Langer, Individually and as Independent Executrix of the Estate of Matthew Robert Gardner, II, Deceased, Appellant, v. Iowa Beef Packers, Inc., an Iowa Corporation, Appellee, and No. 19,619 Maryjo Feldmiller Langer, Individually and as Independent Executrix of the Estate of Matthew Robert Gardner, II, Deceased, Appellee, v. Iowa Beef Packers, Inc., an Iowa Corporation, Appellant, 8 Cir., 420 F.2d 365.

Except that Mr. Gardner had worked for IBP longer than the plaintiffs here and the agreement for a bonus had been made through different people the cases are comparable.

Defendant offered some testimony that a compensation committee established pay rates and that Mr. Gardner had no authority to fix wages and bonuses but the record does not show that as an issue at trial and we find here no challenge to Mr. Gardner's authority. The trial court's allowance of bonuses was computed from the defendant's allocation of funds.

IV. There was evidence of an agreement to pay bonuses, acceptance and reliance thereon, recognition by defendant and the allocation of a fund for that purpose.

We affirm the judgment of the trial court in awarding judgments to the several plaintiffs in the bonus case.

V. Each of the plaintiffs herein held a stock purchase option granted by defendant. The Perry plant, together with plaintiffs as employees, was sold before any options were exercised. Defendant denied that plaintiffs had any rights thereunder. The option agreement in writing provided in part as follows:

"1. IBP hereby grants to OPTIONEE the right and option to purchase 25 shares of common stock, One Dollar and Fifty Cents ($1.50) par value, of IBP at a price

of $36.50 per share on the terms and conditions set forth in this grant.

"2. The OPTIONEE agrees to remain with and render his services to IBP for a period of not less than two years from the date of the granting of this option, but such agreement shall not impose upon IBP any obligation to retain the OPTIONEE in its employ for any period. * * *

"6. In the event OPTIONEE ceases to be an employee of IBP or any subsidiary thereof for any reason, whether voluntarily, involuntarily, or by death, any option or unexpired portion thereof granted to him which is otherwise exercisable shall thereupon terminate."

The number of shares involved varied from 15 to 50. It was admitted that "on August 22, 1965, the defendant declared a one hundred per cent (100%) stock dividend and each of the plaintiffs thereby had a right to twice the number of shares as set forth on the option for the same aggregate dollar amount as before the stock dividend was declared."

The agreement provided that after optionee had been in continuous employ of IBP for two years the option could be exercised to the extent of 40% of the number of shares granted, after 3 years an additional 20%, after 4 years an additional 20% and after 4 years and 11 months the remaining 20%.

All of the plaintiffs had been employed by IBP for more than a year. Most had been employed for more than 2 years, the others for slightly less time, but two years had not elapsed since the date of the written option agreement.

The point that plaintiffs were not entitled to proportionate exercise of the option, i. e., 40% is not stressed except as it is included in defendant's denial of any right.

Under date of February 16, 1965 plaintiffs were advised in writing in part as follows:

"As one of the group of key personnel of IBP you were included among those members of the company who were granted stock options so that you would become one of the partners in the corporation. Since the beginning of our operations through 1964, 100 supervisors and key personnel have been granted these options. About a month ago we distributed 55 more of these restricted stock options to new or replacement supervisors ond other key people. This option made you, in fact, a partner in IBP.

"So that you may better know and realize the value of these options, this explanation is being sent to you and is also being sent to holders of options previously granted so everyone will again be reminded of the value of the options which they now hold."

On July 22, 1965 plaintiffs were advised in part as follows:

"Since the beginning of our company we have endeavored to choose an association of supervisors, department heads, production foremen, superintendents and plant managers from those men whom we felt cared very strongly about the direction and the development of this company. Men willing to expend the extra effort that excellence of performance always entails. We designed a system which we felt would also enable these men to share in the extra rewards that extra efforts bring. That's why stock options were given to each man in a position of responsibility."

There is no claim that any of the plaintiffs failed to perform as urged. It was admitted that on October 31, 1967, the plaintiffs by and through their attorney, Leland C. White, tendered cash in payment and for the exercise of the stock options to one P. L. Nyman, vice president of the defendant, at the general office of the defendant in Dakota City, Nebraska, which tender was refused by Mr. Nyman, and the grounds for refusal stated by Mr. Nyman were that the tender was ridiculous.

A special verdict was submitted to the jury and answered as follows:

"Special Verdict No. 4—Have the plaintiffs established that the parties did not contemplate the sale of the Perry Plant at the time they entered into the agreements with respect to stock option? Answer 'yes' or 'no.' Answer: Yes. 'Robert Scott, Foreman.'"

The correctness of this finding is not challenged.

In ruling on post-trial motion of defendant the trial court held:

"The special verdicts herein were not submitted in the form of general verdicts and need not and should not be set aside. However, the court believes, finds and holds that the evidence in this cause does not support the various plaintiffs' demands for judgment. Judgment is accordingly entered for the defendant and against each plaintiff."

From this judgment plaintiffs appealed.

VI. As noted in Division III, supra, M. R. Gardner sued IBP in federal court for a bonus and the right to exercise a stock option. In the case before us the trial court held the same as the United States District Court in the Gardner case. Subsequent thereto and a few days before the submission of this appeal the United States Court of Appeals for the Eighth Circuit reversed the United States District Court on the stock option issue. We quote from the first paragraph of the opinion:

"Is a stock option agreement which provides that the option shall terminate if the optionee ceases to be an employer of the optionor 'for any reason, whether voluntarily, [or] involuntarily' terminated by the optionor's sale of a part of the assets of its business including the optionee's employment contract? The District Court held in the affirmative as a matter of Law. We reversed." 420 F.2d 365.

IBP petitioned for rehearing.

The only difference, except as to number of shares, of any materiality whatsoever between the Gardner case and the case before us is that Gardner had just completed two years of service. We do not consider this difference controlling. His stock option contained similar provisions.

We do not consider the issues raised in defendant's petition for rehearing as controlling here.

The Gardner opinion is so applicable and the analysis of Iowa law so appropriate that we quote extensively:

"On September 23, 1963, M. R. Gardner and Iowa Beef Packers, Inc. (IBP), entered into a Stock Option Agreement under which Gardner was given an option to purchase one hundred shares of the common stock of IBP for $1,615. In consideration for this option, Gardner agreed to remain in continuous employment for IBP for two years before the option could be exercised. The option was, thereafter, to remain open and exercisable for a period of three years, from September 23, 1965, until September 23, 1968.

"The Stock Option Agreement included the following section:

'5. In the event OPTIONEE ceases to be an employee of IBP or any subsidiary thereof for any reason, whether voluntarily, involuntarily, or by death, any option or unexpired portion thereof granted to him which is otherwise exercisable shall thereupon terminate.'

" * * *

"On October 22, 1965, less than a month after Gardner completed the two years of service, his consideration for the stock option, and before he had exercised his option, IBP sold the plant at Perry to Oscar Mayer & Company. Included in the sale were the assignment of the employment contracts of the personnel at the Perry plant and a covenant by IBP not to hire the Perry plant personnel for a period of eighteen months after the sale. Gardner's

employment with IBP, therefore, was severed by the sale.

"On Saturday, October 23, 1965, IBP attempted to reach Gardner by telephone to request that he travel to Denison to discuss the sale. Gardner, however, was out of town, and he did not learn of the sale until October 25, 1965. He was told on that date, by the Chairman of the Board of IBP, that since Gardner was no longer working for IBP, his stock option was 'invalid.'

"On February 24, 1966, Gardner tendered payment of $1,615 to IBP to purchase the stock under the Stock Option Agreement. The tender was refused by IBP.

"Initially, we note that the assignment of Gardner's employment contract was made in good faith and was not done for the purpose of affecting Gardner's option. The question presented is simply whether the District Court correctly applied Iowa law by holding that the option terminated upon IBP's sale of part of its assets including Gardner's employment contract.

"We hold that the District Court correctly decided that this issue should be determined as a matter of law, but erred in its application of the law. Contract interpretation is generally a matter of law, while the intent of the parties is generally a question of fact. [Citations] But where no extrinsic evidence is necessary to determine the intent of the parties, and where the intent is implicit from the agreement and from its context, the legal effect of the agreement is properly resolved by the courts as a matter of law. [Citations]

"IBP argues on appeal that the District Court correctly interpreted the Stock Option Agreement, that the language of Section 5 of the Agreement is clear, and that the plain meaning of that section requires a termination of Gardner's option because of the sale of the Perry plant. We cannot agree.

"The primary purpose of a company stock option plan is the attraction and retention of desirable employees, and the granting of an option is considered a form of compensation.

"An option agreement is subject to the same rules of interpretation as an ordinary contract. Maytag Company v. Alward, 253 Iowa 455, 112 N.W.2d 654 (1962). An option is a continuing offer which may not be withdrawn prior to its expiration date for the reason that the promise is based on a consideration. Sargent & Co. v. Heggen, 195 Iowa 361, 190 N.W. 506, 508 (1922). The consideration for an option is the employee's agreement to work for the company for a specified period of time. Maytag Company v. Alward, [253 Iowa 455], 112 N.W.2d at 661.

"In cases with circumstances analogous to the facts here, courts have been reluctant to deny or permit the exercise of options where such would result from an unreasonable or unfair interpretation of the option contract. Maytag Company v. Alward, supra, is persuasive here. In that case, an employee entered into a stock option contract agreeing to remain with the company for three years. Before the three years expired, the employee exercised his option and voluntarily terminated his employment. The company argued that the stock option contract should be rescinded on the ground of failure of consideration. The employee argued that, by the plain meaning of the contract, he should be allowed to keep any options he exercised prior to the termination of his employment. The clause of the contract relied upon by the employee stated that any termination of employment, voluntarily or for cause, would terminate 'any option or options held by him under the Plan, *to the extent not theretofore exercised.*' Maytag Company v. Alward, [253 Iowa 455], 112 N.W.2d at 656. (Emphasis supplied.) The court, holding against the employee because of a failure of consideration, stated that the effect of the employee's argument,

'* * * would render the contract of little value to plaintiff. Defendant * * could virtually terminate plaintiff's rights

under it merely by exercising his option and then violating his agreement to serve. It is quite unlikely the parties intended to enter into such an unreasonable contract.'

Maytag Company v. Alward, [253 Iowa 455], 112 N.W.2d at 658.

"We feel the Iowa court would give weight to the case of Gaines v. Monroe Calculating Mach. Co., Inc., 78 N.J.Super. 168, 188 A.2d 179 (1963). There, the option agreement stated that if the optionee's employment were terminated 'voluntarily or involuntarily within five (5) years from the date of employment,' the company could declare the agreement void. One and a half years later, the company dismissed the optionee without cause and declared the option void. The trial court relied on the plain meaning of the contract and granted summary judgment to the company. The Superior Court of New Jersey reversed.

'The word "involuntarily" has no meaning so absolute that a court may accept it without regard to the context or circumstances in which the word was used. If what the plaintiff says is true, and at this point we must accept it, the word "involuntary" was not meant to, and therefore does not, include discharge without cause, especially one made in bad faith for the purpose of destroying plaintiff's option.'

Gaines v. Monroe Calculating Mach. Co., Inc., [78 N.J.Super. 168], 188 A.2d at 185. The court went on to say:

'* * * it is inconceivable that the parties meant by the word "involuntary" that plaintiff took the risk of losing $75,000 if defendant chose to discharge him at any time, even within a few days or weeks, and without cause.'

Gaines v. Monroe Calculating Mach. Co., Inc., [78 N.J.Super. 168], 188 A.2d 186.

"Other courts have held that an optionee, who has given full consideration under a stock option agreement, has an absolute right or a vested right to exercise the option despite the broad termination language employed by the optionor in the agreement. O'Brien v. United Home Life Insurance Co., 147 F.Supp. 761 (E.D.Mich.1957), aff'd 250 F.2d 483 (6th Cir. 1958). For a review of the related cases adhering to the vested rights' theory, see Lucas v. Seagrave Corporation, 277 F.Supp. 338 (D.Minn. 1967).

"It is our conclusion that the interpretation of the Stock Option Agreement urged by IBP would not be sustained by the Iowa court. We cannot believe that the parties here intended that the optionee give full consideration under the Agreement and then be deprived of his right to exercise the option by the sale of his employment contract. As we interpret Section 5 of the Agreement, it does not mean that termination of the option could result from the sale of the optionee's employment contract without prior notice thereof to the optionee.

"It may be, however, that the parties, at the time of contracting, never put their minds to the question of sale of an employment contract. We do not believe that this would alter the decision of the Iowa court because, in such an instance, it has been held that the employee 'should have the advantage of his boss's language.' Ulmann v. Sunset-McKee Company, 221 F.2d 128, 133 (9th Cir. 1955). See also, Freese v. Town of Alburnett, 255 Iowa 1264, 125 N.W.2d 790, 793 (1964).

"IBP argues that the language of Section 5 is clear and that this Court is permitted to construe contractual language only when it is ambiguous. The Iowa Supreme Court rejected a similar argument in Hamilton v. Wosepka, Iowa, 154 N.W.2d 164 (1967), agreeing with Wigmore's statement that such a rule is only a 'vestigial remain of a notion prevailing in "primitive law."' Hamilton v. Wosepka, 154 N.W.2d at 171. The court went on to cite with approval the language used in United States v. Lennox

Metal Manufacturing Co., 225 F.2d 302, 310–311 (2d Cir. 1955):

'* * * "Any such rule, like all rules of interpretation, must be taken as a guide, not a dictator. The text should always be read in its context." '

Hamilton v. Wosepka, 154 N.W.2d at 172.

"Hamilton v. Wosepka, supra, reviewed the rules of construction to be used as an aid in contract interpretation. We have adhered to those principles here."

The court of appeals was correct in thinking that our court would give weight to the cited authorities. We are in agreement with what is said in the Gardner case.

VII. The jury's finding that the sale of the Perry plant was not contemplated when the options were granted is not controverted and establishes that the sale was not a condition subsequent contemplated as a vitiation of the option rights. In other words, what happened was not within any of the things intended by the parties and was not necessarily controlled by the written option conditions.

For discussion of contract interpretation see Hamilton v. Wosepka, 261 Iowa ——, 154 N.W.2d 164, cited with approval in the Gardner case.

On page 168 of 154 N.W.2d we quoted Professor Corbin as follows:

" 'The purpose of interpretation as justice requires is always the discovery of actual intention:—the intentions of both parties if they are the same,—the actual intention of one party if the other knew or had reason to know what it was,—but absolutely never to give effect to the meaning of words that neither party in fact gave them, however many other people might have given them that meaning.' "

Restatement, Contracts, § 307, says:

"The happening of a condition subsequent that by the specific terms of a contract is to terminate a promisor's duty does not operate as a termination if the hap-pening of the condition is caused or rendered inevitable by

"(a) the promisor's unjustified conduct, or

"(b) events that occur without the promisee's fault, and that cannot have been within the contemplation of the parties when the contract was made, unless continuance of the duty subjects the promisor to a materially increased burden."

See also Kramer v. Mericle, 195 Iowa 404, 407, 192 N.W. 257, and Martin v. Star Publishing Co., 50 Del. (11 Terry) 181, 126 A.2d 238.

VIII. As was said in Gardner, supra, the interpretation of the contract is a matter of law for the court.

At the end of two years plaintiffs were entitled to exercise their respective options to the extent of 40%. Full rights would not accrue until the end of 4 years and 11 months.

In October 1967, more than 2 years after the date of the option agreement but long before plaintiffs would have been entitled to exercise their final options, plaintiffs tendered payment and demanded the issuance of the entire amount of stock. The tender was refused in its entirety.

In Kollman v. McGregor, 240 Iowa 1331, 39 N.W.2d 302, supra, we recognized the right of apportionment when an employee was discharged prematurely and without cause.

Such a doctrine brings equity, justice and fairness into the construction of contracts. We think it is applicable here.

The option rights were progressive based on continuing good service over a period of 4 years and 11 months. To project plaintiffs' rights that far into the future would involve too many uncertainties. There is no way of knowing that plaintiffs would even have wanted to work that long. They might have been discharged for incompetence, quit voluntarily or died. (Mr.

Gardner did die.) Plaintiffs were obligated to serve if they wanted to exercise their full options. There is nothing to show that they would or could have continued to serve that long. As we held in Maytag v. Alward, supra, an employee's voluntary termination of employment constitutes a failure of consideration and a breach of an option contract.

However, in the case before us they could have served two years except for the sale of defendant's Perry plant, together with the right to employ plaintiffs. They were still alive and working.

We conclude that plaintiffs were entitled to exercise their options for the 2 years, i. e. to the extent of the 40% of the total amount specified in their respective agreements.

The profitable sale by defendant would indicate benefits to defendant from the services of plaintiffs to the date of sale. Anything beyond 40% would give plaintiffs something to which they were not entitled and which they had not earned.

IX. In the Gardner case the record was not such that damages could be determined on appeal. The case was remanded to the district court for determination.

In this case plaintiffs alleged and defendant admitted the common stock of the defendant had a fair market value of $47.00 per share on October 31, 1967, the date payment under the stock option was tendered. The contract grants the option to purchase at $36.50. The measure of damages is the difference between the contract price and the market price at the time fixed for performance of the contract.

Since the contract in question was entered into prior to July 4, 1966, the Uniform Commercial Codes does not apply, section 554.10101, Code, 1966. The applicable statute is section 554.68(3), Code, 1962: "Where there is an available market for the goods in question, the measure of damages, in the absence of special circumstances showing proximate damages of a greater amount, is the difference between the contract price and the market or current price of the goods at the time or times when they ought to have been. delivered, or, if no time was fixed, then at the time of the refusal to deliver." Cf. Coombs and Company of Ogden v. Reed, 5 Utah 2d 419, 303 P.2d 1097.

The number of shares of stock respectively covered by plaintiffs' options was admitted. It was also admitted that by virtue of the 100 percent stock dividend each plaintiff would be entitled to twice the number of shares listed for the same total sum. Defendant had advised the optionees that the stock dividend would double the number of shares but halve the value of each share. The option agreement specifically provided: " * * * that no fractional share be issued upon any such exercise and the aggregate price paid shall be appropriately reduced on account of any fractional share not issued."

The rights of plaintiffs to purchase stock by virtue of the stock dividend and damages as of October 31, 1967 for each plaintiff are listed in the following table. The shares are computed at 40 percent of the original agreement.

| Plaintiff | Option Shares 10/31/67 | Option Price | Value of Shares at $47.00 | Damages |
|---|---|---|---|---|
| Gene Hilgenberg | 20 | $365 | $940 | $575 |
| Robert Chinberg | 20 | $365 | $940 | $575 |
| Walter Sembach | 40 | $730 | $1,880 | $1,150 |

| Plaintiff | Option Shares 10/31/67 | Option Price | Value of Shares at $47.00 | Damages |
|---|---|---|---|---|
| Merlin Powell | 16 | $292 | $752 | $460 |
| James Harvey | 16 | $292 | $752 | $460 |
| Gene Johnson | 16 | $292 | $752 | $460 |
| Richard Wilson | 16 | $292 | $752 | $460 |
| Paul Lindgren | 16 | $292 | $752 | $460 |
| Robert Jenkins | 20 | $365 | $940 | $575 |
| Geraldine Berner | 12 | $219 | $564 | $345 |
| Duane Treft | 16 | $292 | $752 | $460 |
| Bob Mikelson | 16 | $292 | $752 | $460 |
| Danny Anderson | 16 | $292 | $752 | $460 |
| Clyde McMullin | 16 | $292 | $752 | $460 |
| Dean Leesley | 20 | $365 | $940 | $575 |

The judgment shall provide for interest at the legal rate from October 31, 1967. 5 Corbin, Contracts, § 1046, page 284: " * * * Interest is recoverable, even though the computation of the amount due requires the application of market prices, provided that the market prices to be applied can be established with a reasonable degree of definiteness and certainty. * * *." Cf. Weaver Construction Co. v. Farmers National Bank of Webster City, 253 Iowa 1280, 115 N.W.2d 804.

X. On the bonus issue, district court no. 21666, the trial court is affirmed.

On the stock option case, district court no. 22099, the trial court is reversed and the case is remanded to the district court for the entry of judgment in accordance herewith.

Affirmed in part and reversed in part.

All Justices concur, except RAWLINGS, J., who takes no part.