**John L. SCHWIEGER and Dwayne Vande Stouwe, Appellants,**

v.

**IOWA BEEF PROCESSORS, INC., Appellee.**

**No. 85–1868.**

United States Court of Appeals, Eighth Circuit.

Submitted Feb. 10, 1986.

Decided Oct. 3, 1986.

Ned A. Stockdale, Estherville, Iowa, for appellants.

---

Terry R. Wittler, Lincoln, Neb., for appellee.

Before LAY, Chief Judge, ROSS and WOLLMAN, Circuit Judges.

LAY, Chief Judge.

John Schwieger and Dwayne Vande Stouwe are former executives of Iowa Beef Processors, Inc. (IBP), who participated in IBP's qualified stock option plan. Schwieger and Vande Stouwe brought suit against IBP for breach of contract and promissory estoppel, alleging that IBP improperly refused to allow them to exercise their vested stock options upon their involuntary termination. The district court[1] granted summary judgment against Schwieger and Vande Stouwe on the ground that the plaintiffs were precluded from exercising their options under the terms of the option agreement. We reverse and remand to the district court for further proceedings in accord with this opinion.

## Background

As a financial incentive for its key employees, IBP has for many years offered such employees the opportunity to participate in the company's qualified stock option plans. Under these plans, key employees were annually granted options to purchase a given quantity of IBP stock at not less than the market price on the day the option was granted. These options were exercisable in installments, with 40% exercisable after two years of issuance and an additional 20% exercisable in each succeeding year. Any options not exercised within five years of issuance automatically expired. The option plan further provided that if the optionee ceased to be an employee of IBP for any reason, all options previously granted to the optionee would terminate unless exercised within three months after the optionee ceased to be an IBP employee. In order to qualify the option plan for favorable tax status under the Internal Revenue Code, each option also stated that all "outstanding options" which had been previously granted to the optionee and which had not otherwise expired had to be exercised in full before the optionee could exercise any subsequently issued options.[2]

Participation in a qualified stock option program offered employees significant tax advantages. Under a "qualified" plan, an employee would not recognize income at the time the options were issued or at the time the options were exercised. Instead, the option holder would only have to recognize income at the time he or she sold the stock purchased under an option plan. Moreover, if the employee held the stock for three years before selling it, the income realized from the sale would be taxed at the more favorable long-term capital gains rate. An option plan was deemed "qualified" if it satisfied the conditions set forth in 26 U.S.C. § 422(b)(1976)[3], which required that options under the plan must be issued at not less than market value, that such options must be exercised within five years after issuance, and that previously granted, higher-paid options must be exercised or must expire before subsequently

---

1. The Honorable Edward J. McManus, Senior United States District Judge for the Northern District of Iowa.

2. The legislative history concerning the enactment of this blockage rule states: "The purpose of this provision is to prevent an individual from indirectly gaining an advantage by the employer in effect resetting the price at which an earlier option was issued by issuing a second option at the lower price." S.Rep. No. 830, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. & Ad.News 1673, 1766. *See also* H.R.Rep. No. 749, 88th Cong., 2d Sess., *reprinted in* 1964 U.S. Code Cong. & Ad. News 1313, 1376.

3. Congress eliminated qualified stock option plans under the Tax Reform Act of 1976. As of May 20, 1976, all stock option plans were nonqualified, that is, the participating employee would have to recognize income when the option was exercised and the income would be taxed as ordinary income. 26 U.S.C. § 422(b) (1976). Thus, nonqualified option plans had no tax advantages. The Tax Reform Act of 1976 contained a transitional period for all options issued under *existing* qualified plans: options issued under qualified option plans would continue to be taxed as qualified options if exercised prior to May 21, 1981. *Id.* at § 422(c)(7).

granted, lower-priced options could be exercised.[4]

John Schwieger began working at IBP in 1965 and participated in several qualified stock option plans before he was terminated involuntarily effective January 31, 1978. IBP issued Schwieger options under its 1971 Qualified Stock Option Plan on April 30 and December 5, 1973. Because the price of IBP stock fell, rendering the 1973 stock options worthless, IBP allowed Schwieger and other participating employees to exchange the 1973 options for new options on October 10, 1974. On January 31, 1978, the date of his termination, Schwieger had a 60% vested interest in the October, 1974 options. He also had a 40% vested interest in the options IBP granted him on March 3, 1975. Because the options IBP granted Schwieger in 1973 were deemed "outstanding" under the Internal Revenue Code until April 30 and December 5, 1978, respectively,[5] however, the sequence of exercise provision prevented Schwieger from exercising his October, 1974 and March, 1975 options within three months after he left IBP's employ.

Dwayne Vande Stouwe was similarly prevented by the sequence of exercise provision from exercising lower-priced, partially vested options at the time of his involuntary termination on August 31, 1980. Vande Stouwe began working at IBP in 1971. At the time of his termination, Vande Stouwe had earned 80% of the option granted to him on May 7, 1976, with an adjusted option price of $9.50 per share, and 60% of the option granted to him on January 13, 1977, with an adjusted option price of $10.125 per share. However, Vande Stouwe had earned only 80% of an option IBP granted him on April 5, 1976, at the adjusted option price of $10.167. IBP refused to allow Vande Stouwe to exercise the vested portions of his May, 1976 options and January, 1977 options because, IBP contended, the unearned portion of the higher-priced April 5, 1976, option "blocked" the exercise of the subsequently granted, lower-priced options.

Schwieger and Vande Stouwe brought suit against IBP, alleging that IBP had breached the option agreement by refusing to honor each plaintiff's partially vested options. Schwieger and Vande Stouwe also sought to recover against IBP on the theory of promissory estoppel.[6] The district court granted summary judgment against the plaintiffs as to each of their claims. As to plaintiffs' breach of contract claim, the district court held that the sequence of exercise provision unambiguously limited the exercisability of the plaintiffs' options.

## Discussion

We have previously considered the rights of parties under a similar qualified stock option plan in *Langer v. Iowa Beef Packers, Inc.*, 420 F.2d 365 (8th Cir.1970). As in this case, the employer in *Langer* offered its key employees, as part of its compensa-

---

**4.** The tax consequences are succinctly set forth by the Fifth Circuit Court of Appeals in *McDonald v. C.I.R.*:

[I]f the conditions of sections 421 and 422 are *not* met, then the employee exercising the unqualified option normally recognizes ordinary compensation income, and his employer a deduction, in the amount that the option price is exceeded by the stock's then "fair market value ... determined without regard to any restriction other than a restriction which by its terms will never lapse." § 83(a)(1). On the other hand, if the conditions of sections 421 and 422 *are* met, no income to the employee (or deduction to the employer) is recognized respecting the exercise of the option; section 83(e)(1) provides that section 83 does not apply to the option exercise; and, if following the three-year peri-

od mandated by section 422(a), the stock is disposed of at a price greater than the option price, the resulting gain is taxed at the more favorable long-term capital gains rates.

*McDonald v. C.I.R.*, 764 F.2d 322, 327 (5th Cir. 1985) (footnotes omitted) (emphasis in original).

**5.** An option is deemed "outstanding" until it is exercised in full or expires by reason of lapse of time. 26 U.S.C. § 422(c)(2) (1982). Thus, even though Schwieger had exchanged his earlier, higher-priced options, they were deemed "outstanding" until they expired five years after issuance.

**6.** Since we conclude that principles of contract law are dispositive of the case, we do not decide the promissory estoppel issue on appeal.

tion package, the opportunity to participate in a qualified stock option plan. After the plaintiff-employee's option had vested, but before the employee had exercised the option, the employer in *Langer* sold its assets, including the plaintiff's employment contract. Because the employee was no longer working for the employer, the employer contended that the stock option was invalid. The employer relied on language in the option contract stating that the option shall terminate if the optionee ceases to be an employee of the optionor "for any reason, whether voluntarily, [or] involuntarily." Despite the seemingly unambiguous language in the option contract, this court held that the parties had not intended that the employer could terminate the employee's option rights, after the employee had given consideration under the option contract, by simply selling the employee's contract. *Langer*, 420 F.2d at 369. The court thus held that the sale of the employer's assets had not terminated the employee's option rights, and remanded for a determination of damages. The Supreme Court of Iowa adopted the reasoning of *Langer* in upholding the option rights of other employees of the same company similarly affected by the company's sale of its assets in *Hilgenberg v. Iowa Beef Packers, Inc.*, 175 N.W.2d 353 (Iowa 1970).

We find that this case is governed by *Langer* and *Hilgenberg*. *Langer* makes it clear that ascertaining the intent of the parties is of paramount importance in interpreting a contract, especially where, as here, the interpretation urged by one party would result in a forfeiture of vested rights. As we stated in *Langer*:

> The primary purpose of a company stock option plan is the attraction and retention of desirable employees, and the granting of an option is considered a form of compensation.

> An option agreement is subject to the same rules of interpretation as an ordinary contract. * * * An option is a continuing offer which may not be withdrawn prior to its expiration date for the reason that the promise is based on a consideration. * * * The consideration

for an option is the employee's agreement to work for the company for a specified period of time.

*Langer*, 420 F.2d at 368 (citations and footnote omitted). Schwieger and Vande Stouwe had provided many years of service to IBP before they were involuntarily discharged: Schwieger had been employed by IBP in various management positions for twelve years, and Vande Stouwe had worked for IBP for nine years. Like the plaintiff in *Langer*, Schwieger and Vande Stouwe had provided consideration for the part of the options they sought to exercise.

Notwithstanding this fact, IBP contends that the sequence of exercise provision contained in the options precluded Schwieger and Vande Stouwe from exercising the options. It is undisputed that the sole reason IBP included the sequence of exercise provision in the stock options was to qualify the options issued to its employees for the favorable tax treatment afforded qualified options under 26 U.S.C. § 421 (1976). As such, the terms of the blockage rule served only as an inducement to attract key employees with an investment plan which provided compensation with capital gains treatment. We have difficulty accepting the argument that the parties mutually intended that the optionees could give full consideration under the option agreement and then be deprived of their right to exercise the options because of a provision included in the agreement solely to increase the value of the options *to the optionees*.

IBP relies on state court decisions where an employee voluntarily terminated his or her services and as such was precluded from exercising his or her option rights. *See Broyles v. Synercon Corporation*, 512 S.W.2d 288 (Tenn.1974); *Shepherd v. General Telephone & Electronics Corp.*, 411 Pa. 49, 190 A.2d 895 (1963). But in these cases it was the employee whose conduct directly caused the termination. Here, as in *Langer*, it was the employer's act of termination which prematurely prevented the lapse of the time period in which the earlier, high-priced options would expire.

The trial court distinguished *Langer* and *Hilgenberg* on two grounds: (1) that *Langer* specifically held that the sale of the company, which caused the employee's termination and precluded the running of the time period which would allow exercise of this option, was not contemplated by the parties; and (2) that in *Langer*, this court specifically pointed out that the IRS blockage rule was not incorporated in the option agreement,[7] and as such affected only the tax status of the parties.[8]

We find that the distinctions drawn by the district court between *Langer* and this case are not dispositive here. In *Langer*, the stock option agreement provided: "5. In the event OPTIONEE ceases to be an employee of IBP or any subsidiary thereof for any reason, whether voluntarily, involuntarily, or by death, any option or unexpired portion thereof granted to him which is otherwise exercisable shall thereupon terminate." *Langer*, 420 F.2d at 367. Here the agreement provided that:

> [i]n the event an optionee during his life ceases to be an employee of IBP for any reason, any option or unexpired portion thereof granted to him which is otherwise exercisable shall terminate unless exercised within three (3) months of the date on which he ceases to be an employee, and in any event no later than the date of expiration of the option [i.e. five years after issuance].

There is no issue here as to whether termination was contemplated since plaintiffs attempted to exercise their option within three months of their termination.

More difficult to resolve is the second ground on which the district court distinguished *Langer*. The district court observed that in *Langer*, this court found that the blockage rule under 26 U.S.C. §§ 421–425 was not incorporated into the contract and was therefore not binding on the parties. This observation in *Langer*, however, was not intended to alter the long-standing rule that "[e]xisting statutes and laws with reference to which a contract is made (assuming there are no valid contractual provisions providing otherwise) enter into and become part thereof." *Carlson v. Nelson*, 204 Neb. 765, 285 N.W.2d 505, 509 (1979). Thus, *Langer* must be read in light of the principle that existing statutes become part of every contract and cannot be ignored. In other words, whether or not statutory conditions are expressly incorporated in a contract, the law implies that every statute is part of the terms of that contract. *Langer* must be read in light of this universal principle.

The principal question we are left with is whether the conditions of the statute were intended to affect only the tax status of the optionees or whether the parties intended the terms of the blockage provisions to prevent exercise of the options. In resolving this question, we see no difference between *Langer* and the facts of this case. It is undisputed that the reason that IBP included the blockage rule in the contract was to comply with IRS regulations that every stock option contain this language so as to qualify the exercised option for capital gains treatment. 26 U.S.C. § 422(c)(5). Inclusion of this language provided notice to the employee that in order to qualify the stock option for capital gains treatment the employee had to observe the conditions set forth in the tax code. The blockage rule was intended to benefit only the optionee. We think it is relevant here that: (1) the plaintiffs had fully performed their part of the agreement; (2) they each had vested interests to exercise; (3) the outstanding options were issued at higher prices than the price of the existing stock and it would have been harsh and impractical for the

---

7. IBP relies on 5 Fletcher, *Cyclopedia of the Law of Private Corporations* 554 (1976), for the proposition that where a tax statute is incorporated into the agreement, then the terms of that statute become incorporated terms of the agreement. However, Fletcher relies on *Langer*, so we are still left with the question as to whether the implication within *Langer* is controlling here.

8. *Accord Shaw v. Kruidenier*, 470 F.Supp. 1375, 1385–86 (S.D.Iowa 1979), *aff'd*, 620 F.2d 307 (8th Cir.1980); *Lucas v. Seagrave Corporation*, 277 F.Supp. 338, 342 (D.Minn.1967).

employee to exercise them; (4) the company's termination of the employees prevented the expiration of these outstanding and useless options; and (5) the conditions set out in the blockage rule were solely for the benefit of the plaintiffs and do not affect defendant's performance.[9]

Under circumstances such as these, the nonoccurrence of the condition *can* be waived by the optionee. *Koedding v. Slaughter*, 634 F.2d 1095, 1097 (8th Cir. 1980); *Rodgers v. Baughman*, 342 N.W.2d 801, 806 (Iowa 1983); *H.L. Munn Lumber Company v. City of Ames*, 176 N.W.2d 813, 816 (Iowa 1970); *Pearce v. ELIC Corp.*, 213 Neb. 193, 201, 329 N.W.2d 74, 79 (1982). This proposition was definitively stated by the Supreme Court of Iowa in *Rodgers v. Baughman*, 342 N.W.2d at 806:

It is well established that a party may waive a condition precedent to his own performance of a contractual duty, when such condition precedent exists for his sole benefit and protection, and compel performance by the other party who has no interest in the performance or nonperformance of the condition. [Citation omitted].

Both Vande Stouwe and Schwieger waived the condition that the option qualify for favorable tax treatment when they at-tempted to exercise their "blocked" options upon termination of their employment.

As in *Langer*, there is no evidence here that the parties contemplated that once the employee has given consideration, he or she could be deprived of the opportunity to exercise rights based upon the adverse tax consequences which the optionee might incur in a premature exercise of the option agreement. *Cf.* Restatement (Second) of Contracts § 229 (1979).[10] Although the option qualified for favorable tax treatment at the time of its issuance, an employee's refusal to abide by the conditions of the option only incurs an unfavorable tax treatment to that employee now, and has no effect on IBP itself.

We see no valid distinction between the option exercised in *Langer* and here. In both cases the sections on qualified options under the IRC were applicable. In both cases we feel the provisions were intended to affect only the tax status of the optionee. On this basis, we remand to the district court. We leave it for the district court and the parties to develop the governing principles and proof of damages that may exist. The issue of damages is not before this court at this time. In the determination of damages, plaintiffs should be placed in the position of exercising the option at the time they attempted to do so.

9. The dissent's criticism of our analysis that exercise of the stock options has no effect on IBP misses its mark. A hindsight observation that IBP will now incur damages because of its breach is not relevant to the issue before us. Our analysis focuses on the effect of the waiver of a condition in a contract by the sole party who will benefit by that condition's enforcement. The condition here—the blockage rule—is merely notice to optionees, required by the IRS, that failure to abide by the blockage rule will have adverse tax consequences to the optionees through loss of capital gain treatment of the transaction.

The blockage rule itself has nothing to do with damages. Damages follow from the promisor's refusal to abide by its promise. Once a breach occurs, damage liability ensues in order to restore the promised bargain. Here the bargain is the consideration agreed upon by the employer, IBP, of the grant of stock options in exchange for the services of the optionee. The employees' waiver of the blockage rule causes

no detriment to IBP but is only the enforcement of this agreed-upon bargain.

10. Section 229 of the Restatement (Second) of Contracts provides: "To the extent that the non-occurrence of a condition would cause disproportionate forfeiture, a court may excuse the non-occurrence of that condition unless its occurrence was a material part of the agreed exchange." This section is designed "to deal with a term [of a contract] that does not appear to be unconscionable at the time the contract is made but that would, because of ensuing events, cause forfeiture." *Id.* at comment a. A "forfeiture is used to refer to the denial of compensation that results when the obligee loses his right to the agreed exchange after he has relied substantially, as by preparation or performance on the expectation of that exchange." *Id.* at comment b. Enforcement of a condition causing forfeiture may also be excused where the purpose of the condition has already been served. *Id.* at illustration 2.

*Cf. Myzel v. Fields,* 386 F.2d 718 (1967), *cert. denied,* 390 U.S. 951 (1968).

The decision of the district court is reversed and the case remanded for further proceedings consistent with this opinion.

ROSS, Circuit Judge, dissenting.

I dissent. The majority opinion interprets a written contract between the company and its employees to exclude a specific provision of the contract which clearly prevents the exercise of one stock option without first exercising an earlier option. It bases its decision, in part, on *Langer v. Iowa Beef Packers, Inc.,* 420 F.2d 365 (1970) which based its holding, in part, on the fact that the specific provision of the contract in this case was not present in the contract in the *Langer* case. *Langer, supra,* 420 F.2d at 369–70. The reliance on *Langer* by the majority is misplaced.

In this case, the blockage provision, on its own, is clearly reasonable. Where a company's stock price declines significantly, as IBP's did, the blockage provision may have the effect of rendering other employee stock options worthless, but such an event is foreseeable and not necessarily unfair. Further, it is entirely consistent with the purposes of a stock option plan, as it: 1) gives employees a true proprietary interest in the company, in the sense that they may either win or lose depending on the success of the company, and 2) thereby motivates employees to work harder to make the company a success. Thus, the holding in *Langer* has no application to this case because the blockage provision alone makes the plaintiffs' stock options worthless.

In Schwieger's case, the only provision which made his stock options worthless was the blockage provision. At the time of his termination, his earlier issued, high-priced stock option was fully exercisable. The termination provision merely had the effect of forcing him to exercise that option within three months of his termination. He apparently chose not to because of the loss he would incur by exercising that option. Because IBP's stock price did not rise significantly in that three-month period, his stock option *remained* worthless.

Rather than following accepted principles of contract law the majority has deleted a provision of a written contract to achieve a result favorable to the employee. In stating that "an employee's refusal to abide by the conditions of the option only incurs an unfavorable tax treatment to that employee now, and has no effect on IBP itself" ignores the fact that this suit by the employees is for damages which they allege total well over one million dollars. It is hard to see how the court's decision today could possibly "have no effect on IBP itself."

I would affirm the judgment of the district court.