BEN BORDEN ET AL. *v.* THE SKINNER CHUCK COMPANY

SUPERIOR COURT    HARTFORD COUNTY    FILE NOS. 108732, 108733

Memorandum filed November 10, 1958

*Levin, Schwartz, Seidman, Zeman & Daly,* of Hartford, for the plaintiffs in both cases.

*Shipman & Goodwin,* of Hartford, for the defendant in both cases.

ALCORN, J. Two actions were tried together. The parties in each are identical. The plaintiffs are factory employees of the defendant who have been continuously employed for varying periods ranging in individual cases from five to sixteen years. In one action the plaintiffs seek to recover for themselves and other employees similarly circumstanced a year-end bonus for the year 1955, and in the other action a like bonus for the year 1956.

The first count of each complaint alleges the breach of a promise by the defendant to pay a year-end bonus to the plaintiffs and those similarly situated; and a second count alleges that the defendant has wrongfully diverted funds which it had "held in

escrow and in trust for the purpose of paying a year-end bonus."

The ensuing discussion is applicable to both actions. From the facts hereinafter set forth it will be apparent that no fund existed which the defendant could be said to have "held in escrow and in trust," and consequently the second count furnishes no basis for relief. In the first count the plaintiffs concededly rely solely upon proof of an express contract. The case therefore differs from *Corriveau* v. *Jenkins Bros.*, 144 Conn. 383, wherein the plaintiffs relied upon an implied contract.

The facts are as follows: The defendant's employees are roughly classified as factory employees, office and branch office employees, salesmen and executive officers. In addition to wages or salaries, the defendant bears the expense of paid vacations and holidays and of various pension plans, and it shares with the employees the expense of employees' insurance of various types. In addition to these items, the defendant made a year-end payment for the first time in 1937. In 1938 it made no year-end payment but in each year from 1939 through 1954 it did make one. The defendant never in any year, however, paid a bonus to all employees. Furthermore, the qualifications entitling an employee to a bonus in any given year varied from year to year. In 1955 and 1956 it paid a bonus to office employees only.

In the years in which a bonus was paid, the procedure was for a committee of the executives to survey the defendant's earnings and other factors toward the end of the year. After determining how much of the earnings for the year might be available for a bonus, they sought authority from the directors to pay a bonus, and the permission, if granted, was in the form of an authorization to the management

to pay a bonus. The defendant had no audited financial statement until October. No amounts were set aside for a bonus during the year, and a bonus, when paid, was disbursed from current cash on hand at the year's end. When management had been authorized by the directors to pay a bonus, the former then determined the amount of the cash on hand which would be allocated to the purpose. The part of this to be paid to executives was then decided upon and deducted from the total to be disbursed. The remainder was then allocated among various employees. Each employee was considered individually and exceptions were made for those specially deserving, while those less deserving were classified accordingly. After determining the sum necessary to meet the requirements of all exceptional cases, it was deducted from the total amount originally decided upon for a bonus payment. The money remaining after deducting the sums to be paid executives and special employee cases was then allocated among such other employees as were to share in the bonus, the amount which each was to receive being determined by arriving at a multiple of the employees' base hourly rates which, taking into account the number of employees to be paid, would absorb the amount of money available. Upon this basis the bonus, in the various years in which it was paid, varied from a sum amounting to as little as twenty times an employee's hourly rate to as much as two hundred times that rate. There was no common principle for determining the amount paid an individual, which depended partly on the hours he had worked and his pay rate. The one constant factor each year was that the employee, in order to qualify at all, must have been employed by the defendant on a specified date near the end of that year, but even this date was chosen annually and varied within a range of three or four weeks.

The plaintiffs received bonuses in the years in which they worked from the beginning of their respective employments through 1954. They received no bonus in either 1955 or 1956. In 1955 and 1956 bonuses were paid only to those office employees who were in the defendant's employ on November 19, 1955, and November 18, 1956, respectively, and who had also been in the defendant's employ on December 24 of the preceding year, respectively. Three thousand dollars was allocated to the purpose in 1955 and $11,585.22 in 1956.

About 1950 the defendant issued a booklet entitled "Know Your Company," in which the following appeared: "It has been customary, since 1937, for the company to make a year end payment to employees. The amount of such payment, if any, depends upon the earnings available from operations, and is entirely at the discretion of the Board of Directors." At the time this booklet was issued, two of the named plaintiffs and over sixty-five other factory employees represented by the plaintiffs had already been in the defendant's employ for varying numbers of years and had shared in the payments theretofore made. Others who became employed at about the time the booklet appeared are not shown to have known of it at the time they undertook employment. At some indeterminate time after publication of the booklet, however, the plaintiffs became aware of it, including the quoted portion. None of the plaintiffs is shown to have inquired into the method of deciding upon the year-end payment described in the booklet until shortly before these actions were brought, and it was then learned that there was no uniformity in the payments.

In 1953 the defendant began to issue to each employee, with his pay, a slip containing the following statement: "In addition to the weekly pay recorded on this slip, The Skinner Chuck Company is re-

quired by law to make payments to cover your Social Security, Unemployment Insurance and Workmens Compensation. These benefits average five cents per hour per person. The Skinner Chuck Company voluntarily contributes payments covering pensions, vacations, holidays, insurance and bonus. These voluntary benefits average 33 cents per hour per person. Thus the company pays an average of 38 cents per hour on your behalf, over and above your regular pay." The parties treat the term "year end payment" in the booklet and the term "bonus" in the pay slip as meaning one and the same thing— namely, what the plaintiffs' complaints call a "year-end bonus." Each plaintiff received such a pay slip each week with his weekly pay during 1955 and 1956. These actions were returnable in April, 1957, and because of them, beginning in May, 1957, the quoted language was omitted from the pay slips. From 1953 to 1957 there were changes in vacations and insurance so that after 1953 the "voluntary benefits" referred to in the quoted language exceeded thirty-three cents and the plaintiffs knew this. The language on the pay slip was not changed, however. In order for it to be kept strictly accurate, an alteration would have been required for every change made in insurance, vacations and the like. Such changes were brought to the attention of employees as they occurred, and the statement on the pay slip was intended only to call to the attention of the employee the fact that each hour he worked cost the company more than his pay envelope showed.

The plaintiffs rely, for proof of an express contract, upon an offer represented by the quoted language from the booklet and pay slips, and an acceptance represented by the plaintiffs' continuing in the employment in reliance upon the offer. No promise by the defendant to make a year-end or bonus payment is claimed to have been made to the plain-

tiffs at any time unless it can be found in the quoted language.

In *Tilbert* v. *Eagle Lock Co.*, 116 Conn. 357, 361, there was an express promise to pay a specified sum of money for the obvious purpose of securing the good will, loyalty and efficiency of employees and to minimize labor turnover, and when the employee conferred the benefit sought, an enforceable contract was created. That case follows the recognized principle that if the effect of an executory promise of a profit is to induce the employee to refrain from quitting, and in reliance thereon he does refrain, then there is sufficient consideration to support an enforceable contract. 1 Williston, Contracts (Rev. Ed.) § 130B. Likewise, where the employee has complied with the terms of a definite offer, the employer cannot avoid his obligation under it by asserting a discretionary power over the offer. *Bird* v. *Connecticut Power Co.,* 144 Conn. 456.

In contemporary thought, a "bonus" is regarded as " 'not a gift or gratuity, but a sum paid for services, or upon a consideration in addition to or in excess of that which would ordinarily be given.' " *George A. Fuller Co.* v. *Brown,* 15 F.2d 672, 676. And it is well established that one employed for an indefinite term who, in response to and in reliance on an offer of a bonus if he continues in service a specified time may recover the bonus if he continues to serve. Note, 28 A.L.R. 331. Consequently, in *George A. Fuller Co.* v. *Brown,* supra, where the company paid the employee a definite sum as a bonus conditioned on his remaining an employee, with the statement that the amount was about 50 per cent of a total which "will be paid," but would be increased if forthcoming profits were greater than on work then done, the employee was entitled to recover the 50 per cent definitely promised, although any amount based on increased profits was too vague for en-

forcement. A like result was reached in *Mabley & Carew Co.* v. *Borden,* 129 Ohio St. 375, where a definite amount was promised; and in *Orton & Steinbrenner Co.* v. *Miltonburger,* 74 Ind. App. 462, where the amount of the bonus was not specified but the company did describe in detail how it would be determined; and in *Roberts* v. *Mays Mills,* 184 N.C. 406, where a definite 10 per cent was offered.

It is basic, however, that there must be an offer upon the employer's part. A mere expression of intention or general willingness to do something on the happening of a particular event or in return for something to be received does not amount to an offer. 1 Williston, Contracts (Rev. Ed.) § 26. The proposition is precisely phrased as follows: "If from a promise, or manifestation of intention, or from the circumstances existing at the time, the person to whom the promise or manifestation is addressed knows or has reason to know that the person making it does not intend it as an expression of his fixed purpose until he has given a further expression of assent, he has not made an offer." Restatement, 1 Contracts § 25.

In the booklet which the defendant issued to its employees, it stated that it had been "customary since 1937" to make "a year end payment," and that the amount thereof "if any, depends upon the earnings available from operations, and is entirely at the discretion of the Board of Directors." Both from the language itself and from the circumstances existing, some further expression from the defendant was necessary and clearly called for to constitute a definite offer. The statement on the pay slip adds nothing. The fact that the plaintiffs knew that the "voluntary benefits" therein listed actually exceeded, in the years in issue, the "average" of "33 cents per hour per person" only adds further uncertainty to an already nebulous matter. Nowhere did the de-

fendant say it would make a year-end payment in either 1955 or 1956. All that it did say, in substance, was that it had been the custom since 1937 to make such a payment but if any was made it would depend upon the earnings available for the purpose as determined by the board of directors.

Standing alone the statement on the pay slip neither offered a bonus in any specific amount nor gave any indication of how one was to be computed. Whether the statement in the booklet concerning the "year end payment" is considered by itself or as explanatory of the word "bonus" in the pay slip, the plaintiffs could not reasonably construe it to mean other than that some further declaration or action must be forthcoming from the defendant before a definite offer could exist. Without an offer to start with, there obviously could be no contract.

While the absence of an offer is decisive of the case, the fact should be noted that the plaintiffs have failed to establish that what they claim was an offer by the defendant induced them to refrain from quitting or that they did refrain from quitting because of it. 1 Williston, Contracts (Rev. Ed.) § 130B. This is not a case involving a single employee. Two of the named plaintiffs and many other employees whom they represent had continued in the employ of the defendant for many years before either the booklet or pay slip in issue ever appeared. The appearance of neither the booklet nor the pay slip altered in the least the continuity of employment which in those instances had become established.

Enter judgment for the defendant in each case.