No. 58,337

DEAN R. LESSLEY, *Appellee*, v. SAMUEL A. HARDAGE, HARDAGE ENTERPRISES, INC., HARDAGE DEVELOPMENT CORPORATION, and HARDAGE CONSTRUCTION CORPORATION, *Appellants*.

(727 P.2d 440)

 Opinion
filed October 31, 1986. 

Richard C. Hite, of Kahrs, Nelson, Fanning, Hite & Kellogg, of Wichita, argued the cause, and Marc A. Powell, of the same firm, was with him on the brief for appellants.

G. Gordon Atcheson, of Hall, Turner and Pike, Chartered, of Wichita, argued the cause, and was on the brief for appellee.

The opinion of the court was delivered by

MILLER, J.: This is an action for breach of an employment contract. Dean R. Lessley, plaintiff, recovered a judgment against defendants Samuel A. Hardage and three Hardage corporations following a jury trial in Sedgwick District Court. Defendants appealed, and we ordered the case transferred to this court pursuant to K.S.A. 20-3018(c). Defendants contend that the trial court erred in overruling defense motions for summary judgment and directed verdict. Involved therein are the questions of whether there was an enforceable contractual obligation upon defendants to pay plaintiff cash bonuses and, if so, whether under the evidence plaintiff is entitled to recover on claims arising out of the Wichita Royale and the Beacon Building projects.

It is a familiar rule that when the sufficiency of the evidence to support the judgment is challenged on appeal, we review the evidence in the light most favorable to the party who prevailed at trial. Long v. Deere & Co., 238 Kan. 766, 715 P.2d 1023 (1986); Tice v. Ebeling, 238 Kan. 704, 708, 715 P.2d 397 (1986); Ratterree v. Bartlett, 238 Kan. 11, 707 P.2d 1063 (1985); Toumberlin v. Haas, 236 Kan. 138, Syl. ¶ 5, 689 P.2d 808 (1984).

The rules governing the consideration of a motion for summary judgment are no less familiar. Summary judgment is proper if no genuine issue of fact remains, giving the benefit of all inferences which may be drawn from the admitted facts to the party against whom judgment is sought. A trial court, in ruling on motions for summary judgment, should search the record to determine whether issues of material fact do exist. When summary judgment is challenged on appeal, this court will read the record in the light most favorable to the party who defended against the motion for summary judgment. Olson v. State Highway Commission, 235 Kan. 20, Syl. ¶ 1, 679 P.2d 167 (1984).

Similarly, in ruling on a motion for a directed verdict, the trial

court is required to resolve all facts and inferences reasonably to be drawn from the evidence in favor of the party against whom the ruling is sought, and, where reasonable minds could reach different conclusions based on the evidence, the motion must be denied and the matter submitted to the jury. This rule must also be applied when appellate review is sought of a ruling on a motion for a directed verdict. *Turner v. Halliburton Co.*, 240 Kan. 1, Syl. ¶ 1, 722 P.2d 1106 (1986); *E F Hutton & Co. v. Heim*, 236 Kan. 603, 609, 694 P.2d 445 (1985). Accordingly, we will review the facts and state them in the light most favorable to the plaintiff.

Samuel Hardage started his original real estate development company, Contemporary Mobile Home Corporation, in Los Angeles in 1969. The corporate name was changed several years later to U. S. Communities, Inc. He also had one or two wholly owned subsidiaries for management or construction. Apparently, Hardage's and his corporations' major experience, from 1969 to 1975, was in the construction and development of over thirty mobile home parks. In 1973, company headquarters was moved from Los Angeles to Wichita. Hardage Enterprises, Inc., was formed in 1975. Its first project was a mobile home park in Lincoln, Nebraska. This included construction of the pads that the mobile homes sit on; a clubhouse; a swimming pool; sewer, water, gas, and electric service; and paving and grading. This was the only project completed by defendants in the period 1975-1979. At the end of 1979, Hardage became interested in the development of office buildings. (The defendant corporations are all closely held and interrelated, and the parties stipulated that judgment against any defendant shall constitute judgment against all defendants. We will not attempt to distinguish between the acts of Hardage, individually or as a corporate officer, and the several Hardage corporations, defendants herein.)

Dean Lessley graduated from Colorado State University with a degree in finance and economics, and then received a master's degree in business administration from the University of Denver in 1967. Following graduation, he was employed or connected with various real estate development and consulting firms. He had wide experience in the design, construction, and finance of commercial buildings. His last position, before joining Hardage, was as the chief operating officer of United Research Systems, a publicly traded company. During his tenure with that firm, it

would typically have 150 active projects going on at the same time in perhaps 35 or 40 states. In December 1979 and January 1980, he was contacted by at least three executive recruitment firms, all of whom expressed an interest in his background. Each felt that Lessley would fill the requirements of clients who had open positions. One of these recruitment firms called plaintiff and discussed a position with Hardage Enterprises. Lessley was planning to take the position of executive vice president with a San Francisco firm which is the largest architectural landscaping firm in the United States when, due to the urging of an executive recruitment firm employee, Lessley flew to Wichita for an interview with Hardage.

During that interview, which occurred on March 4 or 5, 1980, Hardage described his firm, its prior experience in building mobile home parks, and his hopes and aspirations for the company in the field of real estate development in the future. Hardage described generally the salaries and fringe benefits offered to key employees and he also described a plan by which key employees in the company would share in company projects. He called this his "golden handcuffs" plan, by which he hoped to keep key employees with him. Later that evening, Lessley returned to Colorado where he was vacationing. No agreement was reached.

On March 7, 1980, Hardage, who by that time was also vacationing in Colorado, called Lessley and the two had a lengthy telephone conversation. Both parties agreed that Hardage would pay Lessley an annual salary of $55,000, would provide Lessley with executive fringe benefits, including life insurance and health insurance, and would provide Lessley with a company car. Lessley was promised a salary review after six months. The controversy over the terms of employment centers around additional benefits that Lessley claims Hardage promised. During the negotiations, Hardage described to Lessley a plan by which key employees of his company would share in company projects. There is no dispute that there was a discussion about this plan. Lessley testified that Hardage promised that 10% of each project on which the company worked would be set aside for key employees. This would then be distributed to the key employees based upon a determination by Mr. Hardage of the percentage that each key employee would receive. This percentage was to

be based upon the quantity and quality of each employee's work. Where Hardage retained an interest in the project, 10% of that interest would be set aside for key employees and, once each employee's ,percentage of interest was determined (based on quality and quantity of work), that percentage would vest in the individual employee at the rate of 20% per year so that at the end of five years the individual employee's percentage interest in the project would be completely vested. There is no dispute over Hardage's promise to set aside 10% of retained equity for key employees. The dispute is over key employees' participation in cash income, where there is no retained equity. Lessley testified that Hardage told him that he would share in cash proceeds coming to the company in the same fashion as he would share in retained equity. Lessley testified that he specifically asked Hardage about cash participation. He testified:

"Q. [Direct Examination by Mr. Turner] . . . Was there any other portion of a project that you would benefit from?

"A. Yes. As direct outgrowth of my conversations with Mr. Hardage about consulting fees, about construction management fees and about development fees, I asked very specifically beyond just real estate ownership, what about participation in project cash and he said yes. There is to be a commensurate distribution to the key employees of project cash.

"Q. Now, are you talking about commensurate, commensurate with the ten percent, is that what you're talking about?

"A. That is exactly correct, could be either equity, could be cash or if both were available, it could be both.

"Q. Okay. And that was his explanation to you, is that correct?

"A. That is absolutely correct."

Lessley made contemporaneous notes of this conversation. These were received in evidence.

Hardage denied that he ever promised Lessley any cash participation. He contended that his plan to share with key employees involved only a share in retained equity, *i.e.*, when Hardage would keep an interest in a completed project, 10% of the interest retained would.be set aside for key employees. This plan, according to Hardage, did not extend to projects where Hardage received only cash and kept no interest in the project. He testified that he made no promise that employees would share in cash received by the corporation.

As a result of the agreement reached in the March 7 telephone conversation, Lessley came to work for Hardage, starting on March 31, 1980. He started at a salary of $55,000. This was

increased to $60,000 on October 1, 1980, and to $70,000 on June 1, 1981. He was furnished a car and various fringe benefits, and he was granted equity participation of 3% in one project in October 1980, and 20% of another in 1981. In late November 1981, Hardage announced a change in the "golden handcuffs" plan. He increased the percentage of company projects available to key employees from 10% to the lesser of 25% of the total project or 50% of Hardage's retained interest in the project. A dispute arose in the spring of 1982 over the right of key employees to participate in cash receipts of the Hardage companies.

In April 1982, the key employees met, without Hardage's knowledge, at a private club in Wichita for the purpose of discussing cash participation in two specific projects—the Beacon Building and the Wichita Royale projects. Apparently Mr. Nelson, one of the key employees present, had set up the Beacon Building project so that, instead of retaining its equity in the building, the company would sell its equity for cash. Nelson and other key employees believed that they should receive a share of the proceeds from that sale. Each person at this meeting indicated what percentage he thought each key employee was entitled to on each of the two projects. These figures were totalled and then averaged. Apparently these employees agreed that the final numbers represented the deserved shares.

At a meeting of company executives held a few days later on April 17, 1982, Hardage announced a new organizational format which eliminated Lessley's position as executive vice president; he was to be retained as development officer. Nelson expressed the desires of key employees to share in cash proceeds from development of projects, and Lessley agreed with him. Hardage disagreed. A heated discussion followed. Hardage denied that key employees were entitled to any cash participation. The issue was not decided.

On May 27, 1982, Lessley prepared a written summary of the amounts of cash he believed that he was entitled to on six projects. He drafted a letter to Hardage and left it on his desk, but had no response. He wrote again, but received no response. At the conclusion of a staff meeting held on June 21, Lessley and Hardage held a conference over the items set forth in the letter. Lessley testified that Hardage agreed that Lessley was entitled to three of the claims totalling $255,000, but wanted to wait on

the three other projects until they were completed or the company's interest therein had been sold. Lessley insisted that the matter be settled, and said that if it was not he would seek legal recourse. He was promptly fired, and moved out of the office that day. This suit followed.

At the conclusion of a three-week trial, the jury resolved the issues by responding to special questions. The jury found that the parties entered into an employment contract whereby Lessley was guaranteed participation in cash received by Hardage on real estate development contracts, and that Hardage breached that contract by failing to compensate Lessley for his work on the South Hutchinson feasibility study, the Plaza feasibility study, and the Beacon Building project. It also found that Hardage breached Lessley's employment contract by failing to compensate him for his work on the Wichita Royale project, and that Hardage failed to act in good faith in regard to that project. The dollar amounts found by the jury to be due plaintiff are as follows:

| South Hutchinson Feasibility Study | $ 3,800.00 |
| IMA Plaza Feasibility Study | 1,000.00 |
| Beacon Building Project | 100,000.00 |
| Wichita Royale Project | 57,000.00 |

Finally, the jury found that, although the parties entered into an employment contract whereby Lessley was guaranteed equity participation in real estate development projects, he was not entitled to recover on his claim regarding the Central-Greenwich project. Judgment was entered for plaintiff for $161,800 plus interest and costs. Defendants appeal. There is no cross-appeal.

We now turn to the issues raised on appeal. Did the trial court err in overruling defendants' motions for summary judgment and directed verdict, because there was no contractual obligation requiring the payment of cash bonuses? As noted above, there was ample evidence that Hardage promised Lessley that he would participate in cash received by Hardage on real estate development projects. That decision on the facts, however, does not completely determine the issue.

Hardage contends, first, that the alleged oral contract was not sufficiently definite and certain to create an obligation to pay cash bonuses. Second, he contends that an implied obligation of honest judgment cannot be used to supply essential terms of an

agreement—in this instance, the amount of the bonus actually promised.

The general rule for evaluating the sufficiency of the definiteness of contractual terms is stated in *Hays v. Underwood, Administrator,* 196 Kan. 265, 267-68, 411 P.2d 717 (1966):

"[I]n order for an agreement to be binding it must be sufficiently definite as to its terms and requirements as to enable a court to determine what acts are to be performed and when performance is complete. The court must be able to fix definitely the legal liability of the party. We have adhered to this general rule. [Citations omitted.]

"Again, however, the courts generally have so far deviated from the general rule and set up so many exceptions that it is an exceptional case where the rule can be followed as a complete guide to the determination of the sufficiency and the definiteness of the terms of a contract.

"The courts will so construe an instrument as to carry the intentions of the parties into effect where possible. [Citation omitted.] The law will favor upholding a contract against a claim of uncertainty where one of the parties has performed his part of the contract. A contract may contain imperfections or be lacking in detail but it will not be held void for uncertainty if the court, under the recognized rules of construction, can ascertain the terms and conditions by which the parties intended to be bound." 196 Kan. at 267-68.

In the past, this court has required only reasonable certainty in contracts. In *Richards Aircraft Sales, Inc. v. Vaughn,* 203 Kan. 967, 971, 457 P.2d 691 (1969), we said: "[A]bsolute certainty is not required—only reasonable certainty is necessary."

The basic issue in this case is whether the reservation of discretion by Hardage renders the contract so indefinite as to be unenforceable. Defendants cite considerable authority in support of their position that retention of discretion in determining the amount renders the promise too indefinite to be enforceable. Plaintiff, on the other hand, points out the fact that a fixed amount was to be distributed among the key employees, and that Hardage's discretion must be exercised in good faith. When there is evidence regarding the amount to be distributed, and an announced plan as to how it is to be divided, plaintiff contends that the contract is sufficiently definite to be enforceable. There is authority on both sides of this issue, and no Kansas case is directly on point.

In *Borden v. Skinner Chuck Co.,* 21 Conn. Supp. 184, 150 A.2d 607 (1958), the court determined that a statement in a booklet issued by the employer that bonuses were customarily paid and were entirely within the discretion of the Board of Directors did

not constitute a direct and enforceable offer to pay a bonus. In contrast, Hardage promised the plaintiff that 10% (later 25% or 50%) of equity or cash would be set aside from each venture for key employees. While the exact amount of each employee's share was to be determined later, there was a definite promise to give a particular group of employees a fixed share of the cash or equity. Significantly, the *Borden* court also noted that "where the employee has complied with the terms of a definite offer, the employer cannot avoid his obligation under it by asserting a discretionary power over the offer." 21 Conn. Supp. at 190.

In *Douglass v. Panama, Inc.*, 504 S.W.2d 776, 778 (Tex. 1974), the employer told the employees to "do a good job and you will get a good bonus." Historically, bonuses had only been paid when the company had made profits. A similar case is *Ward v. Berry & Associates, Inc.*, 614 S.W.2d 372 (Tenn. App. 1981), where the court found that the employer had made no commitment although the employer had told the employee that he should earn a bonus of a certain amount by a certain date, and that the amount would be determined by the amount of fees generated by the employee's efforts. The written description of the bonus plan stated that there was no formal bonus arrangement and such would be determined solely on an individual basis. The facts in these cases distinguish them from the case now before us.

*Albertson v. Ralston Purina Co.*, 586 S.W.2d 776 (Mo. App. 1979), involved an entirely different factual situation. It concerned a company plan for a severance gratuity which was to be granted in limited and exceptional cases, subject to approval of the corporate officer. The explicit purpose of the plan was to aid employees between jobs. None of the plaintiffs in that case had been unemployed for any period of time.

*Parrish v. General Motors Corporation*, 137 So.2d 255 (Fla. Dist. App. 1962), concerned retention of a bonus after termination. According to the agreement, employees would be able to retain their bonus rights only to the extent decided by a company committee. The court held that the mere possibility of a bonus did not constitute an enforceable contract right. We have not overlooked other cases cited by defendants, but find them distinguishable and unpersuasive. The case most similar to the case at hand is *Hilgenberg v. Iowa Beef Packers, Inc.*, 175 N.W.2d 353

(Iowa 1970). *Hilgenberg* involved a bonus of indefinite amount—it was to be a percentage of the employee's salary, but no employee was told of the precise percentage. However, the employer had allocated, though not segregated, $14,175 for the payment of bonuses. The jury found that the bonus in *Hilgenberg* was supported by consideration, and it found that the plaintiffs were entitled to the money set aside by the employer. The court apportioned the amount set aside among the employees.

In *Cygan v. Megathlin*, 326 Mass. 732, 96 N.E.2d 702 (1951), the employer agreed to pay the employee a fixed sum and "more later" when the defendants "got on their feet" if the amount requested was "fair and reasonable." Defendants contended they owed nothing over the fixed amount because of indefiniteness. The court held that the promise to pay more was enforceable because the meaning of the general terms could be interpreted with reasonable certainty. The plaintiff, therefore, was entitled to fair and reasonable charges.

Lessley argues, correctly, that the mere existence of a discretionary duty does not render a contract unenforceable. Typically, a good faith obligation is implied to limit the exercise of discretion. For example, in *Griswold v. Heat Corporation*, 108 N.H. 119, 229 A.2d 183 (1967), an employer promised to pay $200 per month for accounting services which the employee "in his sole discretion may render." The court found that the employee was obligated to render some services and to determine the amount in good faith. Two of the cases cited by defendants also refer to good faith. In *Gronlund v. Church & Dwight Co., Inc.*, 514 F. Supp. 1304 (S.D.N.Y. 1981), the court held the employee had no enforceable contractual right to a bonus under defendant's discretionary incentive program which reserved the right to alter or cancel the program. The court noted, however, that the committee in charge could not act arbitrarily. The burden was on the plaintiff to show that the committee's decision was motivated by bad faith or fraud, and that burden was not met.

In *Automatic Sprinkler Corp. v. Anderson*, 243 Ga. 867, 257 S.E.2d 283 (1979), the court discussed the role of good faith in a discretionary bonus plan. The court observed that the general rule is that discretion must be exercised in good faith. It found, however, that the parties contracted to leave bonus decisions to

the uncontrolled discretion of the corporation. The language of the contract indicated that any direct incentive was directly within the discretion of the corporation, and nothing in the employment contract should be interpreted to the contrary. When an employee terminated for certain reasons, the payment or nonpayment of money previously set aside was in the absolute and final discretion of the compensation committee of the Board of Directors. We have no such an agreement here.

The essential term claimed to be lacking in the employment agreement before us is the amount of the cash Lessley would receive. Hardage led employees to believe that they would be compensated in a manner commensurate with the work they did on each project—the quantity and quality of their work. This does not appear to us to be an immeasurable, indefinite compensation scheme. Hardage agreed to place a fixed percentage, readily ascertainable, aside, the same to be divided among key personnel. Once the total sum due the employees was fixed, the allocation of that amount among the key employees would seem here, as in *Hilgenberg*, a matter which a court or jury, upon proper evidence, may determine.

The trial court relied on *Heckard v. Park*, 164 Kan. 216, 188 P.2d 926 (1948), in denying Hardage's motion for summary judgment. In Syl. ¶ 5 of that opinion, we said:

"The law implies that contractual provisions requiring the exercise of judgment or discretion will be honestly exercised and faithfully performed."

Lessley had fully performed the work required of him by the contract. We hold that the oral contract between Lessley and Hardage, as established by the evidence and found by the jury, was sufficiently definite and certain to create an obligation on the part of the employer to pay percentages of retained equity interest and cash to the key employees. We further hold that, while the precise amount of the cash award to which plaintiff is entitled was not fixed in the contract, it is easily determinable, and in this instance was properly determined by the jury upon the basis of the evidence before it. The obligation of honest judgment implied in contracts where the exercise of judgment or discretion is involved cannot be used as a shield to prevent recovery by the plaintiff in this action. We do not regard the precise amount to which plaintiff is entitled to be an essential

term of the agreement, where the amount can readily be determined by the jury.

We next turn to the Wichita Royale project. Did plaintiff state and prove a cause of action for bad faith on the Wichita Royale project? That is the issue before us.

This claim stems from the dissolution of a partnership which had employed Hardage companies to provide project development for the expansion of the Wichita Royale Hotel. The partners were Samuel Hardage, personally, and George Angle. The aim of the partnership was to acquire certain land near the Royale, and to construct a multi-story building. The financing of the project came primarily from George Angle and his banking interests. The Hardage companies, and their key executives, including plaintiff, did substantial work on this project over a period of some months. Eventually, Angle became dissatisfied and decided he wanted out of the partnership. He threatened to sue Hardage if the partnership dissolution was not resolved immediately. The parties, with some of their top executives, met and agreed upon a dissolution of the partnership. Angle had already spent a substantial sum for the development work and, as a result of the dissolution agreement, paid an additional sum in fees for the work the Hardage companies had done on the project. It is not clear from the evidence whether Angle paid $18,000 or $35,000 at this time. Lessley claimed that the companies had earned a total of $1,145,700 in fees at the time the partnership was dissolved. This calculation was based on the percentage of completion multiplied by the projected fees, which were based on projected costs. There is evidence on behalf of the plaintiff that Hardage entered into the "expensive" settlement because he wanted to resolve the dispute with Angle and avoid a lawsuit, since he was at that time involved in a race for the governorship of this state. Hardage's explanation, however, is that by entering into the settlement with Angle he avoided the expense of litigating with Angle either in defending or bringing a suit, and, also, Hardage avoided losing a line of credit with Angle's bank. He was also relieved of $850,000 in capital contributions and of paying another $99,000 in expenditures, and he received a loan commitment of 2.5 million dollars and received payment for all development fees billed to Angle. Thus, Hardage contends that the partnership dissolution agreement demonstrates the exercise of sound business judgment.

The real issue is whether the good faith obligation imposed in the employment contract extends to include the employer's settlement negotiations with a third party. We have found no case, and counsel cite none, which impose such an obligation on an employer. The contract being negotiated and settled is between the employer and the third party. Both must act with good faith toward each other. However, while the impact of the negotiations may affect the compensation available to the employees of each party, that impact is somewhat indirect. In many situations an employee's compensation may be affected by the decisions of his or her employer. An employer's business decisions affect the prices asked for merchandise, market expansion or contraction, whether a factory is closed or another opened, and other elements which reflect the successfulness of a business. These are all factors which perhaps indirectly but ultimately affect the compensation or perhaps the very employment of the employees. Plaintiff contends that, in view of the fact that the key employees were to receive a percentage of the company's fee income, Hardage was duty bound to the employees to pursue Angle through the courts and attempt to collect every bit of the fees which Lessley now claims were earned and due the Hardage companies. Lessley departed from the companies in June, and the settlement with Angle was not entered into until the following October.

The record indicates that Angle agreed to pay $198,350 in bills as part of the dissolution agreement and, in addition, Angle had apparently paid $1,700,000 in costs at the time of the termination. The partnership agreement provided that the partners were to share capital outlay equally, making Hardage liable for $850,000. In addition, Hardage could have been required to come up with half of the equity in the project, which would amount to $3,500,000. Given this financial background, it is not readily apparent that Hardage negotiated a "bad" settlement.

As we noted above, we have found no case in which an employee has been permitted to bring suit against his employer for bad faith in failing to sue a third party or in failing to negotiate with the third party a more favorable settlement of business claims. We see no reason to so rule at this time. To require every employer to take into consideration, in making every business decision, the possible and ultimate effect upon each of his

employees would impose an intolerable burden upon business management. We decline to do so. The award for the Wichita Royale project must be reversed.

Finally, we turn to Hardage's final contention on appeal, that the evidence did not establish that Lessley was entitled to a bonus for his work on the Beacon Building project. The thrust of Hardage's first argument is that Lessley is not entitled to a share of the proceeds from this project because he was no longer employed at the time the company was paid. The authorities upon which Hardage relies are distinguishable because each involves an express contractual condition which had not been met. According to the agreement found by the jury, key employees were to share in a fixed percentage of the proceeds of projects at a rate based upon their respective work done on that project. There was no contractual requirement that the project be completed during the employee's tenure with Hardage. The amount to be received was compensation for work done. Lessley is entitled to a share of the fixed percentage of the proceeds, commensurate with the work he performed.

Lessley's work on this project—and that of other key employees—was thoroughly covered in the evidence. Lessley testified that he coordinated IRB funding for this project and was involved in development of design concepts. He also described all of the areas for which other key employees were responsible. Extensive evidence was provided to the jury by both parties to this litigation of the amount of (or lack of) work done by Lessley on the Beacon Building project. We conclude that the trial court did not err in overruling defendant's motion for a directed verdict on the Beacon Building claim.

The judgment of the trial court awarding plaintiff $57,000 on the Wichita Royale project is reversed; otherwise, the judgment is affirmed.