NOT DESIGNATED FOR PUBLICATION

No. 114,199

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

STANTON D. BARKER,
*Appellant*,

v.

KANSAS DEPARTMENT OF LABOR, *et al.*,
*Appellees*.

MEMORANDUM OPINION

Appeal from Shawnee District Court; RICHARD D. ANDERSON, judge. Opinion filed June 10, 2016. Reversed and remanded with directions.

*Adam M. Hall*, of Collister & Kampschroeder, of Lawrence, for appellant.

*Glenn H. Griffeth*, of Kansas Department of Labor, of Topeka, for appellee Kansas Department of Labor.

*Denise K. Drake*, *Robert A. Sheffield*, and *Uzo N. Nwonwu*, of Littler Mendelson, P.C., of Kansas City, Missouri, for appellee Creative Consumer Concepts, Inc.

Before HILL, P.J., STANDRIDGE and ATCHESON, JJ.

*Per Curiam*:  As a general matter, an employer is obligated to pay its employees what they have earned whether in the form of hourly wages, a fixed salary, or deferred commissions. This dispute between Stanton D. Barker and Creative Consumer Concepts, his former employer, is just that sort of general matter. We, therefore, reverse the decision of the Kansas Department of Labor denying Barker's claim for unpaid commissions and the ruling of the Shawnee County District Court affirming the agency's

1

determination. Consistent with the Kansas Wage Payment Act, K.S.A. 44-313 *et seq.*, and his contractual arrangement with Creative Consumer Concepts, Barker earned commissions for sales made to customers he brought to the company's attention, even though some of the sales were made after he resigned. We, therefore, remand to the Department for a calculation and award of the commissions due Barker, along with such other relief as may be appropriate.

Barker went to work for Creative Consumer Concepts—commonly known as C3—in 2009 in a job requiring him to seek out and screen potential customers for the company's products. As we understand the business, C3 sells inexpensive toy packages, such as crayons and small coloring books, to restaurants that give the items to patrons with young children. After screening a likely customer, Barker would turn the lead over to a C3 sales representative to negotiate a deal. Barker was the only C3 employee scouting business that way. From the start, he was paid a commission based on actual sales to the customers he found and an annual salary.

Particularly pertinent here, Barker and C3 revised his compensation package in 2011. Barker continued to receive a salary augmented with commissions. The agreement called for Barker to receive 5% of the "gross profit" from C3's sales to a qualifying customer during the first and second years of the business relationship and 1% of the gross profit from sales during each of the next 3 years. The agreement defined the first year as the 12-month period commencing when "product is actually shipped" to a customer. Under the arrangement, Barker received commissions only for completed transactions, *i.e.*, the customer had received and paid for the merchandise, since his compensation was figured from actual profits rather than accounts receivable.

Barker and C3 agree he was an at-will employee, although they have differing ideas about the legal significance of that fact. Also, nobody disputes Barker voluntarily left his job with C3 in August 2012. Barker then requested commissions he believed were

due him. Robert Cutler, C3's chief executive officer, denied the request on the ground the company had no obligation to pay after the employment relationship ended.

In January 2013, Barker filed a claim with the Department for unpaid wages, as provided in K.S.A. 44-322a. The Act requires employers to pay "wages" due their employees. K.S.A. 44-314(a). In turn, the Act defines "wages" as "compensation for labor or services rendered by an employee" and includes amounts determined on a commission basis. K.S.A. 44-313(c).

The Department conducted an administrative hearing on the claim in which Barker and C3 were represented by legal counsel and presented evidence. The administrative law judge issued a written ruling denying Barker's claim ostensibly because, as an at-will employee, he had been paid the compensation due him. Barker filed a petition in the district court challenging the administrative ruling under the Kansas Judicial Review Act, K.S.A. 77-601 *et seq.* Based on the written submissions of the parties and the administrative record, the district court issued a detailed memorandum decision affirming the ALJ's ruling. Barker has now appealed to this court. We, too, proceed under the KJRA.

Before turning to our analysis, we mention the Department has filed a brief favoring affirmance, supplementing C3's brief and disputing Barker's. And we dispose of what seems to us a red herring. In April 2012, Barker and Shad Foos, identified as a member of C3's "executive team," signed a memorandum purporting to again revise the commission structure to enhance Barker's earnings. As we understand matters, Barker relied heavily on that memorandum in the administrative hearing as the governing compensation agreement. The ALJ rejected that argument, finding Foos lacked the authority to bind C3. The ALJ, however, also considered the 2011 compensation agreement and determined it did not support Barker's claim for commissions after his termination. In the district court, Barker relied only on the 2011 agreement. The district

3

court plainly considered the case that way in affirming the agency's ruling. C3 has argued that Barker either never presented his claim in reliance on the 2011 agreement or abandoned that basis for his claim at the administrative level. We reject C3's position. The ALJ and the district court clearly considered the 2011 agreement and ruled on its substantive effect on the employment relationship between Barker and C3, so the issue is properly before us.

Under the KJRA, Barker has the burden to show a material error in the agency's decision. K.S.A. 2015 Supp. 77-621(a)(1). The KJRA outlines the specific grounds on which a court may set aside an agency determination, including errors of law and unsupported factual findings. K.S.A. 2015 Supp. 77-621(c). If the issue turns on an interpretation of a statute or some other question of law, we review without deference to the agency's legal analysis. *Redd v. Kansas Truck Center*, 291 Kan. 176, 187-88, 239 P.3d 66 (2010); *Kansas Dept. of Revenue v. Powell*, 290 Kan. 564, 567, 232 P.3d 856 (2010). Judicial review is more limited when an agency's findings of fact have been challenged. A reviewing court may reject a factual finding only if it lacks substantial support in the evidence considering "the record as a whole" in light of the governing standard of proof. In turn, K.S.A. 2015 Supp. 77-621(d) describes how the reviewing court must view the record as a whole in evaluating a particular finding:

> "[T]he adequacy of the evidence . . . shall be judged in light of all the relevant evidence in the record cited by any party that detracts from such finding as well as all of the relevant evidence in the record . . . cited by any party that supports such finding, including any determinations of veracity by the presiding officer who personally observed the demeanor of the witness and the agency's explanation of why the relevant evidence in the record supports its material findings of fact. In reviewing the evidence in light of the record as a whole, the court shall not reweigh the evidence or engage in de novo review."

4

Because the district court heard no additional evidence and ruled on the same agency record available to us, we owe no particular deference to its decision.

The ALJ and the district court misconstrued two significant aspects of Barker's claim for commissions. First, they incorrectly characterized the legal rights and obligations of the parties in an at-will employment relationship. Second, they incorrectly applied the provisions of the written 2011 compensation agreement.

An at-will employment relationship is contractual. See *Smith v. Kansas Orthopaedic Center*, 49 Kan. App. 2d 812, 815-16, 316 P.3d 790 (2013). The employer and the employee exchange mutual promises:  The employee agrees to perform the duties of the job, and the employer agrees to compensate the employee. Each promise of a performance serves as consideration for the other. An exchange of promises supported by consideration is a bilateral contract. *Peoples Exchange Bank v. Miller*, 139 Kan. 3, 7, 29 P.2d 1079 (1934). An at-will contractual relationship, however, has no set or defined term, and either party may end the relationship at any time for any reason or no reason without penalty or future obligation. See *Morriss v. Coleman Co.*, 241 Kan. 501, 510, 518, 738 P.2d 841 (1987) (recognizing at-will employment to be contract without provision covering duration); *Smith*, 49 Kan. App. 2d at 816. When an at-will employment relationship ends, the employer remains obligated to pay the employee any compensation earned for work performed before then. In other words, the termination of the relationship does not extinguish the promise to pay for work already done. See *Colosi v. Electri-Flex Co.*, 965 F.2d 500, 504 (7th Cir. 1992); *Compagnia Importazioni Esportazioni Rappresentanze v. L-3 Communications Corp.*, 703 F. Supp. 2d 296, 308 & n.13 (S.D. N.Y. 2010) (citing general contract law as applied in New York).[*]

[*]In the interests of completeness, we point out that an employer cannot necessarily terminate an at-will employee with impunity. If the reason for termination violates statutory or common-law protections afforded workers, the employer may be liable for a wrongful discharge. For example, an employer subject to Title VII, 42 U.S.C.

5

§ 2000e *et seq.*, cannot lawfully fire or otherwise discriminate against employees based on race, religion, or other specific class characteristics. Similarly, an employer cannot discharge an at-will employee for filing a workers compensation claim. *Pfeifer v. Federal Express Corporation*, 297 Kan. 547, Syl. ¶ 3, 304 P.3d 1226 (2013). Here, Barker voluntarily quit, and the circumstances do not in any way implicate an unlawful discharge.

The 2011 compensation agreement says nothing about whether Barker must remain in C3's employment to receive commissions. The document is silent on the point. Had C3 wanted to limit the payment of commissions that way, it easily could have proposed language to that effect. And assuming Barker wished to continue working for C3, he would have had to accept the condition. The agreement could have provided: "No commissions will be paid after Barker's employment ends." Or it could have said: "Barker must remain an employee of the Company to receive commissions." There is nothing complicated about expressing the idea C3 now wants to read into the arrangement. The absence of such an expression supports a conclusion C3 did not consider such a condition to be of great importance or, at the very least, did not consider it at all. Nothing about the way the commissions were to be handled required Barker to remain an employee of C3. In other words, C3 could perform its promise to calculate and pay commissions perfectly well even after Barker left the company. By then, of course, Barker would have fully performed his promised duties.

All of that points to a fairly unremarkable result: Barker did not have to continue as an employee of C3 to receive commissions under the 2011 agreement. The ALJ rejected that idea as being incompatible with at-will employment. The ALJ seemed to conclude that termination of an at-will agreement extinguishes any and all obligations between the parties. But, as we have discussed, the ALJ's conclusion misperceives the legal principles governing at-will employment. The ALJ, therefore, made a material error of law in rejecting Barker's claim for that reason.

Throughout this case, C3 has aided and abetted that misperception with a fast shuffle—it has argued about the way the commissions were to be computed as if that were the way they were earned. C3 says the amount due Barker in commissions could only be determined after sales to customers had been completed, so he didn't *earn* a commission until then. And, C3 continues, if the sale happened after Barker ended his employment, he should get nothing. But the argument rests on a false premise using a peculiar notion of how someone earns something.

Barker carried out the performance he promised C3 in exchange for a commission by contacting and screening potential customers and delivering them to sales representatives. That's what C3 hired Barker to do, and that's what the company agreed to compensate him for. Barker earned the agreed-upon compensation—salary and an appropriate commission—at that point, all while he worked for C3. The common meaning of "earn" requires no more. The American Heritage Dictionary of the English Language, 561 (5th ed. 2011) (defining "earn" as "[t]o gain . . . for the performance of service, labor, or work"); Merriam-Webster's Collegiate Dictionary, 391 (11th ed. 2003) (defining "earn" as "to receive as return for effort and esp. for work done or services rendered"). Barker was not required to perform any additional duty or service to be paid.

More importantly, C3's argument cannot be reconciled with the statutory definition of wages in K.S.A. 44-313(c). Wages represent compensation, including commissions, "for services rendered by an employee." There is no dispute Barker rendered all the services C3 required of him. C3, therefore, was likewise required to compensate him as it had promised. The Act requires precisely that. K.S.A. 44-314(a).

In this case, the amount of a commission could not be fixed at the time Barker had earned it or, in the words of the wage payment act, rendered his service. And if a given lead Barker developed never ripened into actual sales, he wound up earning a commission of zero. But in every instance, Barker had done the required work and, thus,

7

earned compensation under the agreement. That some of the commissions could be computed only after Barker had left his employment with C3 doesn't mean he failed to earn them in accordance with the 2011 agreement and the wage payment act.

In *Lessley v. Hardage*, 240 Kan. 72, 85, 727 P.2d 440 (1986), the Kansas Supreme Court addressed a closely analogous situation and found that an employee was legally entitled to compensation from a real estate development project even though he had left the company by the time the project was finished. The compensation agreement in *Lessley* provided that "key employees" would receive a portion of "the proceeds of projects" based on the work each had done. Because the agreement did not require the project be completed during the employee's tenure, the employee was legally entitled to share in those proceeds based on the work he performed. The court rejected the employer's argument that it owed the employee nothing because he was gone by the time it had been paid on the project. 240 Kan. at 85.

The ALJ also considered an e-mail exchange between Barker and Cutler in mid-2012 regarding commissions. Barker asked for a draw or advance payment against commissions for sales that had not yet been made or completed. By that time, Cutler apparently understood Barker was considering leaving C3. Cutler conditionally approved a draw but informed Barker that were he to leave C3, he would be expected to return any part of the draw that had not yet been covered by completed sales. Cutler put it this way in the e-mail: "[I]f you leave the organization or are asked to leave the amount of the draw not due based on actual documented sales as of that date are [*sic*] to be returned to the company." Cutler explained in the e-mail recovering an advance in that circumstance would be difficult. Barker apparently chose not to take a draw.

The ALJ construed the e-mail as proving Barker and C3 had agreed he would be paid no commissions after he left the company. But the e-mail doesn't carry the load the ALJ places on it. Cutler essentially acknowledges C3 might never make customer sales

8

covering advances on commissions paid to Barker. But, as we have explained, that's a function of the way the commissions were to be calculated, not whether Barker had earned them. If Barker continued working for C3, any unrealized advance on commissions easily could be offset against his annual salary. That option would be unavailable once he left the company. Depending on the size of the advance, other means of recouping an unrealized advance could be inefficient, expensive, or both. The e-mail doesn't say Barker would receive no more commissions if his employment with C3 ended—only that he would have to return any advance in excess of what he was already due from actual sales. The e-mail, therefore, actually sheds little light on the substantive terms of the 2011 commission agreement.

The district court more or less repeated the legal errors of the ALJ. The district court stated "a reasonable construction" of the 2011 agreement "establishes that commissions were not actually earned until product was shipped." But, as we have said, that confuses the calculation of the commissions with what Barker had to do to earn them. The district court went on to say Barker tries "to claim commissions on sales not yet made" and labeled the claim as "not reasonable." The district court, however, has misconstrued Barker's claim and the 2011 agreement. Under the agreement, Barker should receive commissions based only on completed sales made during the specified 5-year period. Barker's wage claim does not ask for something more than or different from the terms of the agreement. The Kansas Wage Payment Act requires he be compensated in conformity with the agreement and the services he rendered C3. Neither the ALJ nor the district court has properly applied the law. We recognize that depending on when the Department takes up the claim on remand, C3 may still have a continuing obligation to pay Barker commissions on future sales. We presume the Department will tailor any remedy appropriately and retain jurisdiction over the claim as necessary.

We, therefore, reverse the rulings of the ALJ and the district court and remand to the Department with directions that the agency determine the commissions due Barker

9

under the 2011 agreement and enter an award to him for that amount along with such other relief as may be appropriate based on his wage claim and consistent with this decision.